# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2014

Lyle W. Cayce
Clerk

No. 12-20367

EXCEL WILLOWBROOK, L.L.C.; SOUTHSIDE/3500, LTD.; ORTB WAYSIDE, LTD.; MR/VM PARTNERS, LTD.; FL WESTHEIMER WILCHREST, LTD.; LSDSS REALTY GROUP, L.L.C.; EXCEL LITTLE YORK, LTD.; 3300 SAGE, LTD.,

        Plaintiffs - Appellees

v.

JP MORGAN CHASE BANK, NATIONAL ASSOCIATION.,

        Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

        Intervenor - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Consolidated with No. 12-20375

MR/VM PARTNERS, LTD.,

        Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, N.A.,

No. 12-20367

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Consolidated with No. 12-20376

SOUTHSIDE/3500, LTD.,

Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, N.A.,

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Consolidated with No. 12-20377

ORTB WAYSIDE, LTD.,

Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, N.A.,

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Consolidated with No. 12-20378

EXCEL LITTLE YORK, LTD.,

Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, N.A.,

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

No. 12-20367

Consolidated with No. 12-20381

3300 SAGE, LTD.,

Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, N.A.,

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Consolidated with No. 12-20382

FL WESTHEIMER WILCHREST, LTD.; LSDSS REALTY GROUP, L.L.C.,

Plaintiffs - Appellees

v.

JPMORGAN CHASE BANK, N.A.,

Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

4

No. 12-20367

Appeal from the United States District Court
for the Southern District of Texas

Consolidated with No. 12-10784

WEICHSEL FARM LIMITED PARTNERSHIP,

       Plaintiff - Appellee

v.

JP MORGAN CHASE BANK, N.A., Successor-in-Interest to Washington Mutual
Bank,

       Defendant - Appellant

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for
Washington Mutual Bank,

       Intervenor - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, CLEMENT, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Treating Appellants' Petition for Rehearing En Banc as a Petition for
Panel Rehearing, the Petition for Panel Rehearing is DENIED, but we amend
the prior opinion, 740 F.3d 972 (5th Cir. 2014). As amended, the opinion is as
follows:

Washington Mutual Bank failed in 2008. Acting as receiver, the FDIC
conveyed substantially all of WaMu's assets and liabilities to JPMorgan Chase,

including certain long-term real-estate leases. At issue in this case is whether the owners of the leased tracts can enforce the leases against Chase by virtue of the FDIC's conveyance. The district court awarded summary judgment to the landlords. We affirm.

## I.

The facts of this case are straightforward and undisputed. In early 2008, Washington Mutual Bank ("WaMu") entered into lease agreements ("the Leases") with several landlords ("the Landlords") for certain undeveloped tracts of land, which WaMu planned to use for future branch offices. However, WaMu failed on September 25, 2008, before it could complete any banking facilities on the tracts. Pursuant to its authority under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the FDIC stepped into WaMu's shoes and assumed all of its assets and liabilities, including the Leases. The FDIC then solicited bids from private financial institutions for the purchase and assumption of those assets and liabilities, ultimately accepting a $1.8 billion bid by JP Morgan Chase Bank, N.A. ("Chase").

After accepting Chase's bid, the FDIC and Chase executed the Purchase and Assumption Agreement (the "P&A Agreement" or "Agreement"). As relevant here, the Agreement split WaMu's real-estate assets into "Bank Premises" and "Other Real Estate," giving Chase a 90-day option to either accept or reject assets that qualified as Bank Premises but assigning all Other Real Estate to Chase outright. The Agreement defined Bank Premises to include all banking facilities that WaMu owned or leased and actually occupied as of September 25, 2008, the date on which WaMu closed its doors.[1] The Agreement defined Other

---

[1] The Agreement defined Bank Premises as "the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by [WaMu] and that are occupied by [WaMu] as of Bank Closing."

Real Estate to include "all interests in real estate" that did not qualify as Banking Premises, including all "leasehold rights."[2] It is undisputed that WaMu had not yet completed or occupied banking facilities on any of the tracts subject to the Leases as of September 25, 2008. Hence, under the plain language of the Agreement, the Leases qualified as Other Real Estate assigned outright to Chase. Notably, Chase not only accepted the Leases but "expressly assume[d]" and "agree[d] to pay, perform and discharge" all of WaMu's liabilities — liabilities that included WaMu's obligations under the Leases.

Even though the Agreement thus appeared to give Chase no option to reject the Leases or WaMu's obligations thereunder, the FDIC has maintained at all times that "both the FDIC and Chase . . . understood that all of the Leases are Bank Premises leases and that Chase therefore had a 90-day option to accept assignment of each Lease." Consistent with this "understanding," Chase rejected the Leases within 90 days. The FDIC accepted Chase's purported exercise of its option and therefore continued to retain the Leases in its capacity as WaMu's receiver. Thereafter, the FDIC determined that compliance with the Leases would be burdensome to the WaMu receivership and, pursuant to its statutory authority under FIRREA, elected to repudiate the Leases.

The Landlords brought eight separate cases against Chase, alleging breach of the Leases. Seven of the cases were either filed in or removed to the Southern District of Texas, where they were eventually consolidated. The eighth case was filed in the Northern District of Texas. The FDIC intervened on behalf of Chase in all eight cases and moved for summary judgment. It contended that the Landlords lacked "standing" to interpret or enforce the P&A Agreement, as they

---

[2] The Agreement defined Other Real Estate as "all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by [WaMu]."

7

were neither parties nor intended beneficiaries to the Agreement. Hence, the FDIC reasoned, they lacked a legal basis to assert the Leases against Chase.

The Landlords cross-moved for summary judgment, rejoining that they were quintessential creditor beneficiaries to the P&A Agreement and thus had a contractual right to enforce Chase's promise to assume WaMu's obligations under the Leases. In the alternative, the Landlords urged that the P&A Agreement unambiguously assigned the Leases to Chase, that the Agreement thus brought Chase into "privity of estate" with the Landlords, and that under elementary principles of Texas landlord-tenant law, the Landlords therefore had a right to hold Chase liable for breach of the Leases *even if the Landlords lacked contractual authority to enforce the P&A Agreement*.

The district courts granted partial summary judgment to the Landlords in all eight cases, reserving only the question of damages. The parties then stipulated to damages, and the district courts entered final judgments. Although the Southern District agreed with the FDIC that the Landlords were not third-party beneficiaries to the P&A Agreement, both district courts concluded that the Agreement unambiguously assigned the Leases to Chase without giving Chase any option to repudiate, thereby bringing Chase into privity of estate with the Landlords and giving the Landlords a right to hold Chase liable for breach of the Leases. The FDIC appeals on behalf of Chase in its capacity as intervenor. All eight cases are consolidated on appeal.

## II.

The threshold issue on appeal is whether the Landlords qualify as intended beneficiaries to the P&A Agreement, in which case they have a contractual right to enforce Chase's promise to assume WaMu's obligations under the Leases. As the FDIC observes, the Eleventh Circuit and the Ninth Circuit have both recently addressed this question, declining to afford similarly situated landlords third-party beneficiary status under the same P&A

Agreement at issue in this case.[3]  Our sister circuits reasoned that there is a presumption against third-party beneficiary status under government contracts — a presumption that, while it does not require the party seeking enforcement to be "specifically or individually identified in the contract" to be overcome, does require proof that it "fall[s] within a class clearly intended to benefit" from the assignment.[4]  As the FDIC's assignment to Chase included a no-beneficiaries clause, the courts reasoned, the landlords could not possibly overcome this presumption.[5] We are not so sure.

The interpretation and effect of the P&A Agreement is governed by the federal common law of contracts,[6] which draws on the "the core principles of the common law of contracts that are in force in most states."[7]  One of those principles is that a promisor who agrees to satisfy an obligation that the promisee owes to a third party thereby confers enforcement rights to the third party, who qualifies as a creditor beneficiary to the contract.[8]  In the landlord-

---

[3] *See Interface Kanner, LLC v. JPMorgan Chase Bank*, 704 F.3d 927 (11th Cir. 2013); *GECCMC v. JPMorgan Chase Bank*, 671 F.3d 1027 (9th Cir. 2012).

[4] *GECCMC*, 671 F.3d at 1033; *Interface Kanner*, 704 F.3d at 933.

[5] *GECCMC*, 671 F.3d at 1034; *Interface Kanner*, 704 F.3d at 933.

[6] It is well-established that government contracts are governed by federal common law. *E.g.*, *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 189 (5th Cir. 1984). In any event, the P&A Agreement contains a choice-of-law provision selecting federal law. We give effect to choice-of-law provisions unless a party can show that the clause is "unreasonable under the circumstances." *Ginter ex. rel. Ballard v. Bletcher, Prendergast & Laporte*, 536 F.2d 439, 449 (5th Cir. 2008).

[7] *Smith v. United States*, 328 F.3d 760, 767 (5th Cir. 2003) (quoting *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir.1996)).

[8] *See, e.g.*, *Restatement (First) of Contracts* § 136 (1932) ("[A] promise to discharge the promisee's duty creates a duty of the promisor to the creditor beneficiary to perform the promise."); *id.* § 133(1)(b) ("[A] person is . . . a creditor beneficiary if . . . performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary.").  Similarly, under the Restatement (Second) of Contracts "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary

tenant context, it is thus well established that a landlord is a creditor beneficiary to an assignment of a lease by the original tenant to a subsequent tenant — at least if the subsequent tenant expressly agrees to perform the original tenant's obligations under the lease.[9] Here, Chase not only accepted the FDIC's assignment of WaMu's interest in the Leases but "expressly assume[d]" and "agree[d] to pay, perform, and discharge" all of WaMu's liabilities — liabilities that include WaMu's obligations under the Leases. Hence, the Landlords appear to be quintessential creditor beneficiaries to the P&A Agreement.

True, the P&A Agreement contains a clause disclaiming any intention to create third-party beneficiaries. However, as the Landlords observe, the no-beneficiaries clause is qualified by the modifying phrase "except as otherwise specifically provided in this Agreement." And under settled rules of contract construction, Chase's unqualified promise to "expressly assume[] . . . and agree[] to pay, perform, and discharge" all of WaMu's obligations, under the Leases and

---

is appropriate to effectuate the intention of the parties and . . .the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary[.]" *Restatement (Second) of Contracts* § 302(1)(a)*; see also id.* at § 302 cmt. b ("The type of beneficiary covered by Subsection (1)(a) is often referred to as a 'creditor beneficiary.' In such cases the promisee is surety for the promisor, the promise is an asset of the promisee, and a direct action by beneficiary against promisor is normally appropriate to carry out the intention of promisor and promisee, even though no intention is manifested to give the beneficiary the benefit of the promised performance.").

[9] *See, e.g.*, 49 *Am. Jur. 2d Landlord and Tenant* § 962 (2013) ("An express agreement by the assignee of a lease with the assignor to assume the obligations of the lease is enforceable by the landlord as a third-party beneficiary, regardless of whether the landlord is a party to the assumption agreement. . . . However, clearly, not every reference to or mention of the covenants of a lease in an agreement between the lessor and an assignee amounts to an assumption of the covenants by the assignee."); *Restatement (Second) of Property, Land. & Ten.* § 16.1, rptr. n. 4 (1977) ("The transferee of an interest in the leased property, by virtue of the assignment, incurs liability on the burdens of the lease only to the extent such liability is based on privity of estate. . . . If, however, the transferee promises to perform the contractual obligations of the lease, his liability on the promises of the lease is then predicated on a privity of contract in addition to its basis in privity of estate."); 2-17 *Powell on Real Property* § 17.04 (same); Schoshinski, *American Law of Landlord and Tenant* § 8.12 (1980) (same).

otherwise, is arguably tantamount to "specifically" designating the Landlords as creditor beneficiaries. Though Chase and the FDIC now urge that they always understood the Agreement to give Chase an option to reject the Leases, they have made no effort to reform the Agreement to reflect their late-arriving and atextual "understanding."[10]

The Ninth Circuit expressed concern that granting the landlords third-party beneficiary status to enforce the P&A Agreement would "open[] the door to suits from any number of third parties who might claim a benefit from the Agreement's terms."[11] But this fear is exaggerated. The FDIC made an affirmative decision to assign the Leases to Chase. Chase not only accepted the assignment but expressly covenanted to "pay, perform, and discharge" all of WaMu's liabilities — including WaMu's obligations under the Leases. Had the FDIC not assigned the Leases to Chase, or assigned its interest in the Leases without having Chase expressly assume WaMu's liabilities, the Landlords would not qualify as creditor beneficiaries.[12] In our view, affording the Landlords enforcement rights on the narrow facts of this case would not open the floodgates, as the class of persons entitled to third-party beneficiary status would remain exceedingly narrow and subject to the FDIC's control.

Were we writing on a blank slate, we would conclude that the Landlords are creditor beneficiaries to the P&A Agreement and therefore have a

---

[10] *See Restatement (First) of Contracts* § 136 (1932) ("Though the right of the creditor beneficiary arises immediately on the formation of the contract, his right, unlike that of a donee beneficiary, is not immediately indefeasible. . . . [U]ntil the creditor brings suit, or otherwise materially changes his position in reliance on the promise, he may lose his right or have it qualified by a new agreement between the promisor and the promisee."); *see also Restatement (Second) of Contracts* § 311 cmt. f ("in the absence of such an agreement [between promisor and promisee not to vary a duty to a beneficiary without his consent] the parties retain control over the contractual relation they created").

[11] *GECCMC*, 671 F.3d at 1035.

[12] *See supra* note 9 and accompanying text.

contractual right to enforce Chase's promise to assume the Leases. However, we cannot ignore that two of our sister circuits have reached a contrary conclusion on virtually identical facts. In the interest of maintaining uniformity in the construction and enforcement of federal contracts — an area where uniformity is critical — we reluctantly hold that on the narrow facts of this case, the Landlords do not qualify as third-party beneficiaries.

## III.

The next question is whether the district courts erred in concluding that the Landlords have a right to enforce the Leases against Chase by virtue of their "privity of estate" with Chase. The Landlords contend that the P&A Agreement accomplished a complete, present conveyance of the Leases that, under longstanding principles of real-property law, creates privity of estate with Chase and gives the Landlords the legal right to enforce the Leases against Chase — even in the absence of contractual privity. The FDIC rejoins that the Landlords' power to assert the Leases against Chase, if any, must derive from a contractual right to enforce the P&A Agreement, and that privity of estate does not furnish an independent, non-contractual, state-law basis for holding Chase liable. Because the Landlords are neither parties nor third-party beneficiaries to the Agreement, the FDIC reasons, they lack "standing" to interpret the P&A Agreement and conclude that it accomplishes a complete assignment. The FDIC's circular reasoning ignores eight centuries of legal history.

To be sure, in medieval England, a landlord had no right to enforce the covenants in a lease against an assignee of the original tenant: courts reasoned that while the original tenant remained contractually liable for his obligations under the lease (*e.g.*, rent), there was no enforceable contract running between

the landlord and the assignee.[13] However, as noted in the original *Restatement of Property*, "the inconveniences resulting from such a rule [were] manifest," preventing both the landlord and the ultimate tenant from relying on covenants in the original lease.[14] Hence, English courts developed the concept of "real covenants,"[15] a concept that has carried over into American law and the laws of Texas. Real covenants are covenants that "run with the land" and can be enforced by the landlord against an assignee tenant by virtue of their "privity of estate" — *notwithstanding the absence of contractual privity*.[16] However, the content of the conveyance by the original tenant to the subsequent tenant remains critical, as the subsequent tenant only comes into "privity of estate" with the landlord if the landlord can prove that the original tenant assigned away his *entire* interest in the lease (as opposed to a lesser-included portion, *i.e.*, a "sublease").[17] The FDIC's position, under which the landlord lacks "standing"

---

[13] *See* 2-17 *Powell on Real Property* § 17.04[2][b] (2013).

[14] *Restatement (First) of Property, Part III, Introductory Note* (1944).

[15] 2-17 *Powell on Real Property* § 17.04[3] (2013).

[16] *Id.*; *see also, e.g.*, *Friedman on Leases* § 7:5.1[C][1][a] (5th ed. 2008) ("By receiving the assignment . . . the assignee acquires an interest in the premises that brings him into privity of estate with the owner and makes him liable to the owner for the payment of rent and on those covenants that run with the land."); *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 114 (Tex. App. —Houston [14th Dist.] 1996, no writ) ("Liability to the original lessor for the payment of rent or the performance of other lease covenants may arise from either privity of contract or privity of estate. . . . The assignee becomes the tenant in place of the original lessee and is in privity of estate with the lessor. Accordingly, an assignee is liable for the rent and for the performance of the covenants that run with the land."); *Fabrique, Inc. v. Corman*, 796 S.W.2d 790, 793 (Tex. App.—San Antonio 1990, no writ) (same); *Moore v. Kirgan*, 250 S.W.2d 759, 764 (Tex. Civ. App.—El Paso 1952, no writ) (same); *Cauble v. Hansen*, 224 S.W. 922, 923 (Tex. Civ. App.—El Paso 1920, no writ) (same).

[17] 2-17 *Powell on Real Property* § 17.04[2][a], [b] (2013); *see also, e.g.*, *Twelve Oaks*, 938 S.W.2d at 113 ("When a lessee departs with his entire interest in all or part of the property in question, without retaining any reversionary interest, an assignment is created. On the other hand, if the lessee retains any reversionary interest, no matter how small it may be, a sublease is created."); *Moore*, 250 S.W.2d at 764 (same); *Davis v. Vidal*, 151 S.W. 290, 293 (Tex. 1912) (same).

to prove the content and effect of the conveyance between the tenants because he is not a party to the conveyance, would defeat the concept of real covenants, returning our law to that of twelfth-century England.

Accepting that the Landlords have "standing" to prove the content of the P&A Agreement, the next question is whether the Agreement, properly construed, is a complete "assignment" sufficient to create privity of estate under Texas law. The answer to this question is clearly yes. It is undisputed that the Agreement assigned all of WaMu's "Other Real Estate" to Chase outright, and that the FDIC did not retain any interest in such real estate. It is also undisputed that the Leases unambiguously fall within the definition of Other Real Estate set forth in the Agreement. While the FDIC claims that it and Chase intended for the Leases to qualify as "Bank Premises," and that Chase therefore had an option to reject them, it offers this Court no reason to depart from the parol evidence rule, which rests on recognition that the best evidence of the parties' intent at the time of execution is the language of the contract itself. Whether the parol evidence rule applies is a question of federal common law, which is informed "by the core principles of the common law of contracts that are in force in most states."[18] Accordingly, we see no reason to depart from the general principle of the common law of contracts that a non-party in privity to an agreement may assert the parol evidence rule.[19] Because the plain

---

[18] *Smith*, 328 F.3d at 767.

[19] *See*, 11 Williston on Contracts § 33:11 (4th ed. 2013) ("[I]t is generally agreed that the parol evidence rule will apply when the third party attempts to assert rights or claims based on the instrument."); Arthur Corbin, *The Parol Evidence Rule*, 53 Yale L.J. 603, 661-62 (1944) ("The question has been raised whether 'the parol evidence rule' is applicable in favor of or against a third party who has not been a party to the written integration. The answer is definitely in the affirmative if the rule is correctly stated and understood.").

Not surprisingly, Texas law parallels this majority rule. *See Zapata Cnty. Appraisal Dist. v. Coastal Oil & Gas Corp.*, 90 S.W.3d 847, 852 (Tex. App.—San Antonio 2002, no pet.) ("The parol evidence rule . . . extends only to parties to the written instrument, *those in privity with such a party* or one who claims a right or benefit under the contract; the rule is

language of the Agreement indicates that the FDIC assigned away its entire interest in the Leases and that Chase had no option to reject them, the Landlords have established privity of estate with Chase.[20]

Admittedly, some non-Texas cases suggest that privity of estate cannot come into existence unless the assignee tenant *actually takes possession* of the underlying property, and that privity terminates as soon as the assignee tenant gives up possession.[21] Here, it is not clear from the record whether Chase ever took possession of the leased properties.[22] However, aside from the fact that the FDIC (or rather, Chase) has forfeited any argument about possession by failing to raise it below or in its briefs on appeal, the better view is that "[t]he acceptance of a bona fide assignment creates a privity of estate between the lessor and the assignee, and it is not material that the acceptance be followed by

inapplicable to situations where one of the litigants is a stranger to the agreement." (emphasis added) (internal quotation marks omitted) (citations omitted)). Because Texas law parallels the federal common law, we believe whatever error the district court made in applying Texas law is harmless.

[20] To be more precise, the Landlords have established "vertical privity," *i.e.*, privity between WaMu/FDIC (the assignor tenant) and Chase (the assignee tenant). Traditionally, courts also required "horizontal privity" in order enforce real covenants against a successor in interest. Horizontal privity refers to the relationship between the original covenanting parties (here, the Landlords and WaMu), and requires the covenant to be created in conjunction with a conveyance of an estate in land (*e.g.*, a leasehold). Horizontal privity clearly exists in this case, as the covenants that the Landlords seek to enforce are included in the original leases between the Landlords and WaMu. Horizontal privity only becomes a problem when the original covenanting parties reach their agreement independent of any land conveyance (*e.g.*, two neighbors covenant to drain their respective tracts to avoid creating nesting areas for mosquitos). Although Texas appears to retain the horizontal privity requirement, *see Clear Lake Apts, Inc. v. Clear Lake Utilities Co.*, 537 S.W.2d 48, 51 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ granted), commentators agree that it should be abolished, and modern courts rarely mention it. 2-17 *Powell on Real Property* § 17.04[3][c][iii] (2013).

[21] *See, e.g.*, *Gateway I Group, Inc. v. Park Ave. Physicians, PC*, 62 A.D.3d 141, 148 (N.Y. Ct. App. 2009); *FDIC v. Mars*, 821 P.2d 826, 829 (Colo. Ct. App. 1991).

[22] The FDIC's brief suggests that possession initially remained with the FDIC, and that after the FDIC repudiated the leases, possession returned to the Landlords.

the assignee entering into possession of the premises."[23] And while privity of estate terminates upon expiration of the lease term or reassignment by the assignee tenant to another,[24] the Leases in this case do not expire for many years and there is no evidence that Chase has assigned them to any third parties.

However, the Landlords are not necessarily entitled to enforce *all* of the terms of the Leases against Chase merely because they have established privity of estate; rather, such privity only gives them the right to enforce "covenants that run with the land," *i.e.*, "real covenants."[25] A covenant "runs with the land" if it "touches and concerns" the land.[26] While the scope of the "touches and concerns" test has always been somewhat elusive, courts generally agree that the appropriate inquiry is whether the covenant is of a type personal to the original parties to the lease (*e.g.*, the original tenant is a skilled carpenter who

---

[23] 49 *Am. Jur. 2d Landlord and Tenant* § 968 (collecting cases); *see also, e.g.*, *Friedman on Leases* § 7:5.1[C][1][a] (5th ed. 2008) ("Acceptance of the assignment creates the privity of estate and its consequent liability. . . . It is not necessary for the assignee to take possession. It is sufficient that he have the right to possession . . . . An assignee may relieve himself of this liability at any time by in turn assigning to another . . . . But an actual assignment is apparently necessary, rather than abandonment alone."); *Restatement (Second) of Property, Land. & Ten.* § 16.1, rtpr. n. 6 (1977) (same); *Williams v. Safe Deposit & Trust Co.*, 175 A. 331, 333 (Md. 1934) ("Neither does the liability of the assignee on the covenant depend, according to the weight of authority, upon his actual entry or taking possession. It is sufficient if the right of possession exist.").

[24] 2-17 *Powell on Real Property* § 17.04[2][b] (2013).

[25] *Id.* at § 17.04[3]; *Restatement (Second) of Property, Land. & Ten.* § 16.1 (1977); *see also, e.g.*, *Twelve Oaks*, 938 S.W.2d at 114.

[26] 2-12 *Powell on Real Property* § 17.04[3] (2013); *Restatement (Second) of Property, Land. & Ten.* § 16.1 (1977); *see also, e.g.*, *Baywood Estates Property Owners Ass'n, Inc. v. Caolo*, 392 S.W.3d 776, 782 (Tex. App.—Tyler 2012, no pet.). While Texas cases have held that the party to be burdened must also have actual or constructive notice of the covenant for it to "run with the land," *see Baywood Estates*, 392 S.W.3d at 782, these cases confuse real covenants with equitable servitudes. Real covenants require privity of estate and run with the land *regardless of notice*. 2-12 *Powell on Real Property* § 60.04[4] (2013). Equitable servitudes run against a successor in interest even where there is no privity of estate, *if* the successor has actual or constructive notice. *Id.* In essence, then, "the privity requirement for real covenants is replaced by the notice requirement for equitable restrictions." *Id.*

promises to build a custom shed), or of a type that tenants and landlords would typically expect to apply to all successors in interest (*e.g.*, rent).[27] Here, the landlords seek to recover damages arising only out of Chase's breach of the covenants to pay rent and taxes, both of which are standard in commercial leases and therefore, "run with the land."[28] Moreover, the district courts have entered judgments based on the parties' stipulations of facts, in which the parties agreed as to the proper measure of damages arising out of the breach of the leases. Accordingly, we affirm the judgments of the district courts.

We are well aware of the Eleventh Circuit's recent decision in *Interface Kanner, LLC v. JPMorgan Chase Bank*,[29] which held that a landlord lacked "standing" to assert a privity-of-estate-based theory of lease liability on facts virtually identical to this case.[30] But our interest in uniformity, though powerful, does not require us to adopt legal conclusions we believe to be in error.

---

[27] 2-12 *Powell on Real Property* § 17.04[3] (2013) ("[T]he basic idea [is] that lease covenants will not run to successors of the tenant unless the contracting parties intend them to. . . . [M]odern cases seek to determine whether the original parties intended the covenant to be personal to the promisor and promisee, or whether the covenant was instead intended to regulate the relations of any parties who might be acting as landlord and tenant of the affected premises. Except when the covenant is found to have a personal character, both benefit and burden will run to the successors of the original landlord and tenant.").

[28] *See, e.g.*, 2-17 *Powell on Real Property* § 17.04[3][b] (2013) ("Courts have held that the burden of covenants runs to assignees of the tenant where the covenants address the payment of rent [and] the payment of assessments or taxes."); *Restatement (Second) of Property*, *Land. & Ten.* § 16.1, rptr. n. 3 (1977) ("Promises in a lease involving the promise to pay money are also subject to meeting the 'touch and concern' requirement as applied by the courts. . . . Liability of a transferee on a promise to pay rent and taxes is well settled. . . . In the area of promises to pay for insurance, what little authority exists as to a "bare" promise to insure holds that such a promise is personal and does not run with the land.").

[29] 704 F.3d 927 (11th Cir. 2013).

[30] *See id.* at 933; *see also Hillside Metro Associates, LLC v. JPMorgan Chase Bank, N.A.*, No. 12-3302-CV, 2014 WL 401303, at *5 (2d Cir. Feb. 4, 2014) ("we hold that Hillside lacks prudential standing to litigate whether WaMu's liabilities were assigned to Chase under the PAA because it was neither a contracting party nor a third-party beneficiary under the Agreement").

The *Kanner* court devoted the vast majority of its opinion to explaining why the landlord was not an intended beneficiary to the P&A Agreement and thus lacked "standing" to interpret or enforce it.[31] While not fully persuaded, we can abide by this conclusion, the critical point for present purposes is that the *Kanner* court *also* concluded, in a two-sentence paragraph at the end of its opinion, that the landlord could not enforce his lease against Chase by virtue of his privity of estate with Chase.[32] The court reasoned that the landlord's privity-based theory of liability "is dependent on [the landlord's] ability to enforce its interpretation of the P&A Agreement, which, as discussed above, [the landlord] lacks standing to do."[33] This tautology traces the FDIC's reasoning here and fails to accommodate the concept of privity of estate and real covenants. English courts developed privity of estate to allow a landlord to enforce real covenants against an assignee tenant *even in the absence of contractual privity*. And a landlord *always* needs to prove the content of the conveyance between the original tenant and the subsequent tenant in order to establish privity of estate with the latter, as privity comes into existence only where the original tenant assigns away her entire interest in the lease. If we were to hold that a landlord lacks "standing," *ab initio*, to prove the content and effect of an assignment between tenants, we would make enforcement of real covenants impracticable.[34]

In our view, the *Kanner* decision was — like the Ninth Circuit's decision in *GECCMC* and the Second Circuit's decision in *Hillside Metro* — driven by a

---

[31] *See id.* at 931–33.

[32] *See id.* at 933.

[33] *Id.*

[34] And the continued vitality of prudential "standing" is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). *See id.* at 1388 ("[A] court . . . cannot limit a cause of action . . . merely because 'prudence' dictates.").

fear that holding Chase to the terms of leases it assumed under the P&A Agreement would somehow interfere with the FDIC's ability to administer failed banks.[35] With all respect, we do not share this concern. We do not doubt that the FDIC requires sweeping authority to manage a failed bank's affairs — authority that includes the power to repudiate leases if the FDIC determines that they would be burdensome and that repudiation would promote the orderly administration of the conservatorship.[36] Here, however, the FDIC chose *not* to exercise that authority, instead assigning the Leases outright to Chase in the P&A Agreement. And, as aforementioned, Chase not only agreed to the assignment, but expressly assumed all of WaMu's liabilities. The FDIC can avoid its present plight in future cases by drafting contractual provisions for the right it seeks to claim.[37]

## IV.

We AFFIRM the judgments of the district courts.

---

[35] *See GECCMC*, 671 F.3d at 1035–36; *cf. Interface Kanner*, 704 F.3d at 933.

[36] *See* 12 U.S.C. § 1821(e)(1). When the FDIC repudiates a lease, FIRREA limits the landlord's damages to unpaid rent that accrues before repudiation. *See id.* § 1821(e)(4)(B).

[37] Notably, the FDIC acknowledged in a prior case before this Court that it has since revised its P&A Agreements to clarify that an acquiring bank's option to reject real estate leases extends to *all* leases. *See* Rec. Doc. No. 29 at 5–6 (reproducing colloquy between Hon. Edith Jones and counsel for the FDIC at oral argument).

EDITH BROWN CLEMENT, Circuit Judge, concurring in the judgment.

This result has more to do with the arguments that the FDIC did not raise than the innate correctness of the Landlords' position.

The FDIC argues that the Landlords lack standing because they cannot, as a non-third-party beneficiary to the contract, show that the properties were transferred to Chase. The Landlords have no such issue. To demonstrate standing, the Landlords need to show (1) "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted). The Landlords make that showing. They claim to have (1) suffered an injury (loss of rents), that was (2) causally connected to Chase's conduct (not paying rents that were due), and (3) could be redressed by an award of unpaid rents. Moreover, the Landlords' interest in rent payments from assignees is legally protected by Texas law. *See, e.g.*, *Amco Trust, Inc. v. Naylor*, 317 S.W.2d 47, 50 (Tex. 1958) ("Liability to the original lessor for the payment of rent . . . may arise from . . . privity of estate. . . . One who . . . acquires the entire leasehold estate becomes the tenant in place of the lessee and is in privity of estate with the lessor. An assignee is accordingly liable for the rent reserved in the lease.").

The FDIC's counterargument that non-third-party beneficiaries cannot interpret and enforce a contract against the understanding of the contracting parties improperly tries to stretch a question of contract law into a dubious principle of constitutional law. Non-third-party beneficiaries to contracts usually cannot show that they have suffered an injury to a legally protected interest because contract law does not recognize and compensate non-third-party

beneficiaries for the injuries that they often suffer when a contracting party fails to comply with a contract. But when jurisdiction is otherwise proper, there is no inherent bar prohibiting a stranger to a contract from asking the court to interpret a contract that has bearing on its case.[1] Texas law vests the Landlords with the legitimate protected interest needed to assert their claim for unpaid rent in federal court. This is enough to create standing.

Rather than having an inherent standing problem, the Landlords *should* have difficulty demonstrating that the Purchase and Assumption Agreement actually transferred the leases outright to Chase. The Landlords' position is almost certainly inconsistent with the actual intent of the contracting parties; they provide no persuasive reason why Chase would want its option to refuse certain properties to extend only to constructed and operating bank branches, and not also to properties for future bank premises. The vacant lots are of little value to Chase if not used as bank premises. And the parties' course of performance—which "is often the strongest evidence" of a contract's meaning[2]—also supports that conclusion. From the beginning, both parties' behavior has reflected a belief that the contract grants Chase the option to refuse the leases, regardless of whether a branch had yet been constructed.

Accordingly, though the district courts had the power to consider the cases, Chase should have been able to prevent the Landlords from proving that the

---

[1] *See, e.g.*, *J.R. Fulton v. L&N Consultants, Inc.*, 715 F.2d 1413, 1418-21 (10th Cir. 1982)*; United States v. Ivey*, 414 F.2d 199, 203 (5th Cir. 1969); *Clark v. United States*, 341 F.2d 691, 693-95 (9th Cir. 1965); *Great Am. Ins. Co., N.Y. v. Gulf Marine Drilling No. 1*, 302 F.2d 332, 334-35 (5th Cir. 1962); *Pugh v. Comm'r*, 49 F.2d 76, 79 (5th Cir. 1931); *cf. Lemke v. Sears, Roebuck & Co.*, 853 F.2d 253, 254-55 & n.4 (4th Cir. 1988) (remanding case for reconsideration of a non-party's claims that they were released from liability by a prior contract even though the court "strongly question[ed] whether the language of the . . . release evidenced a clear intent to benefit" the non-party).

[2] *Restatement (Second) of Contracts* § 202 cmt. g (1981).

leases were transferred. Given the record evidence substantiating the contracting parties' intent, the FDIC and Chase likely had colorable arguments (and supporting evidence) regarding the proper interpretation of the Purchase and Assumption Agreement. Even if they thought that those arguments were hopeless given the plain text of the contract, Chase and the FDIC could have pursued a contract reformation, *see, e.g.*, *Restatement (Second) of Contracts* § 155 (1981), or simply amended the Purchase and Assumption Agreement.

All of those strategies would have been preferable to attacking courts' ability to hear cases brought by landlords against assignees—a question on which the FDIC is on the wrong side of (1) hundreds of years of legal history, (2) previous legal positions adopted by the federal government when it itself is a landlord, *see, e.g.*, *Alaska Statebank*, 111 IBLA 300, 308-09 (IBLA 1989), and (3) circuit precedent rejecting attempts by contracting parties to have contracts interpreted "according to the[ir] wishes . . . rather than [the meaning] attributable to it by law" when the parties neither claim mistake nor omission in drafting the contract, nor seek reformation. *Great Am. Ins. Co.*, 302 F.2d at 334-35. The FDIC would have been better served by arguing that *this* contract did not transfer *these* leases.

But Chase should not expect to win on arguments that it does not pursue. The district courts—based upon the arguments raised and the evidence before them—properly entered judgments for the Landlords. The plain text of the contract indicates the leases at issue were transferred outright and the covenant to pay rent runs with the land. On appeal, the only real error that the FDIC successfully highlights is the district courts' choice to apply Texas law to interpret the Purchase and Assumption Agreement. Though Texas state law provides the Landlords' cause of action, federal common law should have been

used to interpret the Purchase and Assumption Agreement.[3] However, the FDIC does not point out any consequence from the district courts' error, and concedes that "the outcome is likely the same" under either body of law. In light of the FDIC's concessions and the plain text of the Purchase and Assumption Agreement, it appears that any error was harmless, and that the district courts' judgments should be affirmed.

---

[3] "[F]ederal common law governs the construction of government contracts in the usual case," *Clem Perrin Marine Towing, Inc. v. Pan. Canal Co.*, 730 F.2d 186, 189 (5th Cir. 1984), and even if this is not "the usual case," as Clause 13.4 of the Agreement specifies that it should be interpreted according to federal law (or Washington law if there is an "absence of controlling federal law"), Texas choice-of-law principles would still require the application of federal common law (or Washington law). *See, e.g.*, *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004).