# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-51083

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2015

Lyle W. Cayce
Clerk

CENTRAL SOUTHWEST TEXAS DEVELOPMENT, L.L.C.,

Plaintiff - Appellee

v.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

Defendant - Appellant

FDIC/ WASHINGTON MUTUAL BANK, Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank,

Intervenor - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and SOUTHWICK and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

This is yet another in a series of cases concerning an obscure but heavily litigated consequence of the largest bank failure in U.S. history: the fate of Washington Mutual's (WaMu) leases for real estate on which bank branches were as yet unbuilt at the time of the company's collapse. In an earlier case addressing this issue, *Excel Willowbrook, L.L.C. v. JPMorgan Chase Bank, N.A.*, 758 F.3d 592 (5th Cir. 2014), we held that WaMu's landlords had

standing to bring a breach of contract claim against JPMorgan Chase, which had been assigned WaMu's leases by virtue of its agreement to acquire WaMu from the Federal Deposit Insurance Corporation (FDIC).  In this case, although its decision preceded *Excel Willowbrook*, the district court also ruled in favor of the lessor, Central Southwest Texas Development.  Appellants—both Chase and the FDIC, which intervened in the case and briefed this appeal on Chase's behalf—urge us to distinguish this case from *Excel Willowbrook* on two grounds, either of which would be sufficient for reversal: first, that Central lacks prudential standing to sue because prior to WaMu's failure it neither owned nor possessed the property it agreed to lease, and therefore was not in privity of estate with Chase; and second, that the lease was terminated by mutual agreement.  Concluding that the first issue was not raised below and that there is no reason to disturb the trial court's finding that no mutual termination occurred, we affirm.

## I.

Central and WaMu entered into a lease agreement in November 2007. ROA 2123.  Central was to construct a WaMu bank branch in Austin, and deliver it to WaMu by January 1, 2008, after which WaMu would owe rent to Central for the twenty-year term of the lease.  ROA 2123.  Central did not yet have fee simple ownership of the property, but had contracted with Frank Bomar to purchase it and had deposited $15,000 in earnest money in escrow. ROA 2123, 1786.  However, after a number of extensions of the deadline, Central had not yet closed on the property at the time of WaMu's collapse in September 2008. ROA 2123–24.  Nonetheless, according to the district court's findings, Central "regarded itself as being obligated to purchase the property at all times relevant to this case." *Cent. Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, N.A.*, 2012 WL 11937377, at *2 (W.D. Tex. Aug. 21, 2012).

No. 12-51083

WaMu was declared insolvent on September 25, 2008, and the FDIC was appointed as its receiver.  ROA 2125.  That same day, Chase acquired most of WaMu's assets and liabilities under a Purchase and Assumption (P&A) Agreement with the FDIC.  ROA 2125.  The P&A Agreement divided WaMu's real property interests into two categories: "Bank Premises" and "Other Real Estate."  ROA 2125.  Chase was to acquire all Other Real Estate under the P&A Agreement, but it maintained the right to either accept or decline assignment of Bank Premises assets within a 90-day period.  ROA 2125.  If Chase declined, the FDIC would then be authorized to repudiate "burdensome" leases if doing so would "promote the orderly administration of [WaMu's] affairs."  *See* 12 U.S.C. § 1821(e)(1)(B)–(C).  The lessor of a repudiated lease is only entitled to rent accruing before repudiation.  12 U.S.C. § 1821(e)(4)(B).

Chase and the FDIC informed Central that the lease qualified as Bank Premises, and that the FDIC would therefore be authorized to repudiate the lease if Chase rejected it.  ROA 2126; 2274–75.  Having determined that Chase was unlikely to accept the lease based on the proximity of Chase branches to the leased property, Central saw the writing on the wall; a Central executive emailed the FDIC, noted that a delay in Chase's decision whether to accept the lease would cause problems for Central, and asked to be "release[d] . . . from the Lease obligation in order to pursue other options."  ROA 2126, 1844.  Central was soon notified by Chase of its rejection of the lease and by the FDIC of its repudiation.  ROA 2126–27.  Central subsequently closed on the property with Bomar.  ROA 2127.  Having failed to find a replacement tenant, Central sold the property the same day for $133,704.05 more than the $1,521,789.95 it paid.  ROA 2127.

Central later concluded that the lease did not qualify as Bank Premises under the P&A Agreement because no banking facilities were occupied (or even

3

built) by the time of WaMu's failure.[1]  That means the lease was "Other Real Estate" that passed to Chase when it acquired WaMu.  *See Excel Willowbrook*, 758 F.3d at 595–96 ("[U]nder the plain language of the Agreement, the Leases [for banking facilities unoccupied at the time of WaMu's failure] qualified as Other Real Estate assigned outright to Chase.").

With this new understanding of the lease's status, Central filed this lawsuit against Chase for breach.  Red Br. 5.  The FDIC intervened on Chase's side.  After Central moved for summary judgment, the district court held that the lease was not a Bank Premises lease, and therefore that Chase could not decline assignment under the P&A Agreement.  ROA 1574.  Consistent with our later ruling in *Excel Willowbrook*, the district court also held that this assignment created privity of estate between Central and Chase, and therefore that Central had standing to assert its interpretation of the P&A Agreement.  ROA 1574–75.  Chase also moved for summary judgment on the ground that the email communications between the parties constituted a mutual termination of the lease.  ROA 2042–43.  The district court denied that motion, holding that "there is at least a fact issue as to whether Plaintiff's communications with the FDIC and Chase constituted a termination or a request to terminate."  ROA 2048.

The case proceeded to a bench trial to resolve the remaining issues.  The district court ruled that Chase's attempted rejection of the lease was an anticipatory breach, entitling Central to contract damages and excusing it from further performance.  ROA 2130–33.  The court then addressed Chase's

---

[1] The P&A Agreement defined Bank Premises as "the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by [WaMu] and that are occupied by [WaMu] as of Bank Closing."  ROA 459.

defense that the lease had been terminated by mutual agreement. ROA 2137. It found that Chase's and the FDIC's communications with Central concerning the P&A Agreement constituted negligent misrepresentations on which Central reasonably relied, noting "it is reasonable to rely when the federal agency which oversees the banking industry . . . tells you that your banking lease may be lawfully rejected" and that Central understood the misrepresentation about the effect of the P&A Agreement to be factual in nature. *Cent. Sw.*, 2012 WL 11937377, at \*9. It also found that "the emails do not constitute a request to terminate" but rather "constitute a request for Chase to finalize its own rejection of the lease as quickly as possible." *Id.* In the alternative, the court held that Chase and the FDIC were estopped from asserting that Central requested termination of the lease "because their misrepresentations induced [Central] to send the emails in question." *Id.* at \*10. The court ultimately awarded Central over $1.3 million in damages,[2] plus prejudgment interest and attorneys' fees. ROA 2152–53. Chase and the FDIC appealed.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011). The district court's grant of summary judgment is also reviewed *de novo*. *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008).

---

[2] The district court calculated the award by subtracting the "fair rental value" from the rent due under the lease, determining the present value of that amount, and reducing the resulting value by Central's profit from the sale of the property. ROA 2146, 2149.

No. 12-51083

**A.**

We begin with the FDIC's argument that Central lacks prudential standing to assert its interpretation of the P&A Agreement. The contours of this issue are particularly well-defined by our recent decision in *Excel Willowbrook.* As in this case, in *Excel Willowbrook* Chase and the FDIC disputed WaMu's landlords' prudential standing to assert an interpretation of the P&A Agreement, to which they were not parties.[3] 758 F.3d at 596. We first addressed the argument that the landlords had standing as third-party beneficiaries of the P&A Agreement. *Id.* at 596–99. "In the interest of maintaining uniformity in the construction and enforcement of federal contracts," an issue governed by federal common law, we followed our sister circuits and held that the presumption against third-party beneficiary status under government contracts decided the question in Chase's favor. *Id.*

We nonetheless found standing on an alternative ground: that "the P&A Agreement accomplished a complete, present conveyance of the Leases that . . . creates privity of estate with Chase and gives the Landlords the legal right to enforce the Leases against Chase." *Id.* at 599. Privity of estate allows a landlord to hold its original tenant's assignees contractually liable under the lease despite the lack of contractual privity. *Id.* We rejected the FDIC's position (and disagreed with the Eleventh Circuit's holding) that the landlords had to establish standing to interpret the P&A Agreement *before* the landlords could establish privity of estate, noting that "a landlord *always* needs to prove the content of the conveyance between the original tenant and the subsequent tenant in order to establish privity of estate with the latter." *Id.* at 603

---

[3] Eight similar suits were consolidated in the *Excel Willowbrook* appeal. 758 F.3d at 596.

(emphasis in original) (discussing *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir.), *cert. denied*, 134 S. Ct. 175 (2013)). Observing that this holding would not interfere with the FDIC's ability to administer failed banks because the agency, by assigning the leases to Chase, chose not to exercise its repudiation authority, we affirmed the district court's ruling in favor of the landlords. *Id.* Other federal courts of appeal, addressing similar cases, have reached a different conclusion. *See Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 50 n.5 (2d Cir. 2014); *Interface Kanner*, 704 F.3d at 933; *see also GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, N.A.*, 671 F.3d 1027 (9th Cir. 2012) (ruling in favor of Chase without addressing privity of estate).

The FDIC attempts to avoid *Excel Willowbrook* by arguing that Central has a weaker case for privity than those plaintiffs because Central "was never in possession of the lot covered by the Lease at any time before the FDIC repudiated the Lease." FDIC Br. 22–23. Its argument against Central's standing to sue thus turns on its characterization of Central's contract with Bomar to purchase the property as a mere option contract that gave Central no possessory interest.

But we need not address whether Central's contract to purchase the property was an option contract, or whether an option contract would deprive Central of privity of estate with Chase, because this defense was never raised in the district court. *See State Indus. Prods. Corp. v. Beta Tech. Inc.*, 575 F.3d 450, 456 (5th Cir. 2009) ("Under our general rule, arguments not raised before the district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'"). Appellants maintain that they raised the defense sufficiently, pointing to their statement in the district court that Central did not own the property, and therefore could not

have leased what it did not possess.  FDIC Reply Br. 4; ROA 1712–13.  This argument, however, was advanced to show that Chase had the right to unilaterally rescind the lease under a provision that allowed WaMu to terminate if Central had not obtained fee title to the property by a certain date. ROA 1712–13.  That is a different issue than the FDIC's contention on appeal that Central's lack of title to the property deprives the company of privity of estate with Chase.  Although we recognize that there is no bright-line rule for determining whether a matter was raised below, *United States v. Brown*, 561 F.3d 420, 435 n.12 (5th Cir. 2009), we find that the arguments in the district court were insufficient to put the court and Central on notice of the defense that the FDIC has raised on appeal.  *See Dallas Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148, 157 (5th Cir. 2013) (noting that a party must "press" an issue "to such a degree that the district court has an opportunity to rule on it"); *see also Kelly v. Foti*, 77 F.3d 819, 823 (5th Cir. 1996) ("The raising party must present the issue so that it places the opposing party and the court on notice that a new issue is being raised." (quoting *Portis v. First Nat'l Bank*, 34 F.3d 325, 331 (5th Cir. 1995)).  In order to address the defense now, we would be forced to analyze it "without the benefit of a full record or lower court determination."  *See New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 387–88 (5th Cir. 2013) (quoting 19 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 205.05[1], at 205–57 (3d ed. 2011)).

Furthermore, the forfeiture inquiry, like other aspects of this case, is aided by *Excel Willowbrook*.  There, Chase and the FDIC asserted a similar exception to privity of estate but focused on the lack of possession on the other side of the landlord-tenant relationship, arguing that "privity of estate cannot come into existence unless the assignee tenant [Chase] *actually takes*

8

*possession* of the underlying property." *Excel Willowbrook*, 758 F.3d at 601 (emphasis in original). We held, however, that the argument was forfeited for failure to raise it in the district court (as well as in the briefs on appeal), even though the general issue of privity of estate was contested below. *Id.*

We may excuse forfeiture when the new issue is "a pure question of law and a miscarriage of justice would result from our failure to consider it." *State Indus.*, 575 F.3d at 456. That is not the case here. Although the FDIC contends that failure to consider its defense would be a miscarriage of justice because the district court's decision was "patently erroneous in light of controlling precedent," *see AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 701 (5th Cir. 2009), Texas law does not provide a straightforward answer to whether this is an option contract.[4] Nor does Texas law directly address whether an option contract would preclude privity.[5] It is also far from clear whether the interests

---

[4] To determine whether an earnest money real estate contract is an option contract or a contract of sale, Texas courts examine a number of factors. The "primary test" is "whether the contract imposes a mandatory obligation upon the seller to accept a sum stipulated as liquidated damages in lieu of the purchaser's further liability." *Chambers Cnty. v. TSP Dev., Ltd.*, 63 S.W.3d 835, 838 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Absent such a provision, the agreement is typically a contract of sale. *City of Harlingen v. Obra Homes, Inc.*, 2005 WL 74121, at *6 (Tex. App.—Corpus Christi Jan. 13, 2005, no pet.). Courts also ask "whether the language of the contract is prospective," "whether time is of the essence," and "whether the language of the contract itself conveys to the party seeking standing any rights to possess or enjoy the property." *Id.*

The "primary" first consideration counsels against a finding that Cenral had an option contract. Although the contract between Central and Bomar was amended to release the earnest money to Bomar, it does not appear that it foreclosed Bomar's ability to seek other relief, because it also provided that "[a]ll terms and provisions . . . that have not been specifically modified . . . remain in full force and effect." ROA 1801. The other three factors, however, point in the direction of an option contract. Given these conflicting indications, it is not obvious how Texas courts would characterize the contract.

[5] The FDIC cites cases for the proposition that an option contract does not pass title to the optionee, *see, e.g.*, *Lefevere v. Sears*, 629 S.W.2d 768, 770 (Tex. App.—El Paso 1981, no writ), but Central cites cases for the proposition that an option contract gives the optionee an equitable interest in the land, *see, e.g.*, *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d

No. 12-51083

of justice favor excusing the forfeiture in order to allow Chase to avoid the obligations it would have had but for Central's lack of possession. *Cf. Lorino v. Crawford Packing Co.*, 142 Tex. 51, 62 (1943) (holding that tenants are generally estopped from contesting landlords' title). And although an intervening, precedential decision in a related case might warrant greater flexibility in allowing a party to raise new issues in response to that ruling, *Excel Willowbrook* relied on the same privity analysis that Central argued in the district court and that the court adopted. ROA 145–46.

We therefore do not address the FDIC's defense that Central lacks privity with Chase as the result of its failure to possess the property in question.

**B.**

We thus turn to the district court's bench trial ruling in Central's favor on the merits. The FDIC's argument for reversal is that the lease was terminated by the mutual agreement of the parties, and therefore that it was error to hold Chase liable for breach. FDIC Br. 26–28. The argument focuses on an email exchange in which a Central executive emailed an FDIC representative, stating that "[w]e have been told that Chase will not be making any decisions on which WaMu Leases Chase plans to accept or reject until Mid to Late December" and that the delay was posing a risk to the company. ROA 1846. He asked that "that WaMu and/or Chase release my group from the Lease obligation . . . . with in [sic] the next week or so." *Id.*

The FDIC disputes the district court's finding that Central was the victim of a negligent misrepresentation concerning Chase's authority to decline

---

487, 489 (Tex. 1988). None of this authority squarely addresses whether an optionee lacks privity of estate with the assignee of its lease.

the lease under the P&A Agreement.  The FDIC draws an analogy to the Texas law of fraud, under which a statement about the legal effect of a document is typically considered an opinion, and therefore does not usually support an action for fraud.  *See Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987).  The district court, however, found an exception because the statements about the effect of the P&A Agreement were "understood . . . to be factual in nature" and because "it is reasonable to rely when the federal agency which oversees the banking industry, and has just taken over one of the nation's largest banks, tells you that your banking lease may be lawfully rejected by both it and the new tenant."  *Cent. Sw.*, 2012 WL 11937377, at \*9 (citing *Fina Supply*, 726 S.W.2d at 540).[6]

Once again, however, we need not address the substance of the FDIC's argument.  Whether the statements about the P&A Agreement amounted to negligent misrepresentations is beside the point if an alternate holding of the district court stands.  Distinct from its determination that Central was the victim of a negligent misrepresentation, the court also held:

> Taking together O'Farrell's testimony at trial, and the email communications as a whole, the Court finds *the emails do not constitute a request to terminate.*  Rather, they constitute a request for Chase to finalize its own rejection of the lease as quickly as possible, so that [Central] could proceed to mitigate by finding a new tenant, or selling the property.

---

[6] *Fina Supply* states that "[a] party having superior knowledge, who takes advantage of another's ignorance of the law to deceive him by studied concealment or misrepresentation, can be held responsible for this conduct," and that "misrepresentations involving a point of law will be considered misrepresentations of fact if they were intended and understood as such."  726 S.W.2d at 540.  That case dealt with an intentional fraud claim; Central has not cited any authority applying the same exceptions when negligent misrepresentation of the legal effect of a document is asserted.

*Cent. Sw.*, 2012 WL 11937377, at \*8–9 (emphasis added) ("Chase's [mutual termination] arguments fail both factually and as a matter of law."). If the district court was correct that no termination occurred,[7] then it does not matter whether statements about the P&A Agreement amounted to misrepresentations that could void the termination.

We agree with the district court's finding that Central's emails did not seek a termination of the lease. The FDIC makes much of the district court's statement that Central "wanted out of [the lease] like a person in a burning house." ROA 2355. Central, however, sought to be released from the lease according to its incorrect understanding of the terms of the P&A Agreement and the FDIC's repudiation authority—it never sought a contractual rescission. *See Tex. Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 414 (Tex. 1970) ("[P]arties may rescind their contract by mutual agreement and thereby discharge themselves from their respective duties. The mutual release of the rights of the parties is regarded as a sufficient consideration for the agreement."). The same email requesting that Chase "release [Central] from the Lease obligation" notes that "[w]e have been told that Chase will not be making any decisions on which WaMu Leases Chase plans to accept or reject until Mid to Late December" and explains the problems that this delay was

---

[7] Although the FDIC disputes whether this finding was clear in the record, our review convinces us that it was, based on the portions quoted above. The confusion on this point may be due to the fact that the district court's negligent misrepresentation analysis preceded its ruling that Central never requested to terminate the lease, which in turn preceded its holding that the opposing parties were estopped from arguing termination after inducing Central's request through misrepresentations. ROA 2137–40. We believe it did so because its analysis of the FDIC's misrepresentation informed its resolution of both of those questions. With regard to its holding that no termination occurred, though, the court's *legal* conclusion about negligent misrepresentation was immaterial—it merely used the FDIC's misrepresentation to help make clear why Central's email, read in context, should not be interpreted as a request to terminate the lease, as we discuss below.

causing for Central. ROA 1844. The district court did not err in concluding that Central was referring to Chase's supposed 90-day option to accept or reject the lease. Central was operating according to its misunderstanding that the lease was for Bank Premises under the P&A Agreement, and was thus requesting that Chase and the FDIC speed up the rejection and repudiation process that Central had been told they were authorized to perform. And this is exactly what Appellants did in response—Chase made it known that it intended to reject the lease in November, and the FDIC subsequently "put the repudiation process on a fast track." ROA 1843. As the district court noted in denying summary judgment, the "FDIC's subsequent putative treatment of the lease provides further confirmation: having received Chase's notice that it did not wish to assume the Lease, FDIC attempted to use its statutory authority to 'disaffirm' the lease—an act which would have been futile and redundant if" the lease had already been terminated. ROA 2046. In light of the language of the email and the surrounding circumstances, we find no error in the district court's finding that the email did not amount to a request to mutually rescind the lease.

We therefore AFFIRM the district court's judgment in favor of Central.