[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15058

_____

D.C. Docket No. 9:12-cv-80533-DMM

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff–Appellee,

versus

FIRST AMERICAN TITLE INSURANCE COMPANY,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 28, 2015)

Before ED CARNES, Chief Judge, RESTANI,[*] Judge, and MERRYDAY,[**] District Judge.

PER CURIAM:

Amid the surge of bank failures during the notorious financial turbulence of 2008–2009, the Federal Deposit Insurance Company, serving as receiver, acquired scores of failed banks. Through a standard "Purchase and Assumption Agreement," the FDIC promptly sold to a successor bank a failed bank's working assets (for example, cash, securities, loans, real estate, furnishings, and equipment) and liabilities (for example, customer deposits and loans from the Federal Reserve Bank). But the purchase agreement reserves to the FDIC an array of rights to sue (for example, the right to sue an officer, director, shareholder, attorney, accountant, or "any other Person") for an actionable event that occurred before the bank failed. In other words, the successor bank bought from the FDIC the opportunities and credit risks of banking, which is the bank's primary business, but not the exigencies of the failed bank's litigation, which is not the bank's primary business.

In this action, the FDIC sues a title insurer for a loss attributable to a mortgage fraud perpetrated against the failed bank, which served as the lender in two real estate closings that occurred before the bank's failure. The title insurer's

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Steven D. Merryday, United States District Judge for the Middle District of Florida, sitting by designation.

principal claim is that the purchase agreement conveys to the successor bank — rather than reserves to the FDIC — the right to sue for the loss. After a bench trial, the district court in a detailed and careful opinion (1) correctly construed the purchase agreement to reserve to the FDIC the right to sue the title insurer and (2) correctly resolved the title insurer's remaining defenses.

## 1. Background

In 2007, Nathaniel Ray agreed to acquire — under false pretenses — two loans, each secured by a mortgage, to purchase two residential condominium units. Acting for the sellers of the units, Craig Turturo, whose testimony the district court explicitly found "not credible," agreed to provide the money for Ray's down payments. Craig Turturo enlisted Frank Turturo Jr., his brother, to appraise the units; Craig Turturo's father, Frank Turturo Sr., invited his client U.S. Mortgage Bankers to serve as the broker. Working for U.S. Mortgage Bankers was Christopher Albert, who is the son of Kamel and Elizabeth Albert (the sellers of one unit) and the brother of Brian Albert (the seller of the other unit).

U.S. Mortgage Bankers introduced BankUnited, F.S.B., (Old Bank) to Ray, who in his applications for the loans materially exaggerated his income. Unaware of Ray's falsification, Old Bank accepted the application and extended the two loans to Ray. First American Title Insurance Company insured the title to each unit.

3

As an independent sales representative for Property Transfer Services, Inc., Frank Turturo Sr. recommended to First American that Property Transfer serve as the closing agent. Accepting Frank Turturo Sr.'s recommendation, First American designated Property Transfer as the closing agent and issued two "closing protection letters," by which First American agreed to reimburse Old Bank for any "actual loss" "arising out of" any prospective "failure" or "dishonesty" by Property Transfer in serving as the closing agent. Old Bank specifically instructed Property Transfer to ensure during each of the two closings that Ray use only his money for the down payment.

Although Property Transfer certified that Ray paid each down payment with only his money, Ray provided no money for the down payment at either closing, each of which Property Transfer nonetheless completed. After the closings, Masterhost, Inc. — an entity with no discernible connection to Ray — wired money to Property Transfer for each down payment. Masterhost was owned by Christopher Albert (the son of the sellers of one unit and the brother of the seller of the other unit). On the day of each closing, Craig Turturo presented to Ray the key to each unit. Six months later, Ray defaulted on each loan.

During the financial turmoil of 2009, the Office of Thrift Supervision of the United States Department of the Treasury closed Old Bank and established the Federal Deposit Insurance Corporation as Old Bank's receiver. In May 2009,

4

employing the FDIC's typical "Purchase and Assumption Agreement," the FDIC conveyed the bulk of Old Bank's assets to BankUnited (New Bank). Entitled "Purchase of Assets," Article III of the purchase agreement states in Section 3.1:

> Assets Purchased by Assuming Bank. With the exception of certain assets expressly excluded in Sections 3.5 and 3.6, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing.

Section 3.5 exempts from the FDIC's sale to New Bank several categories of assets:

> Assets Not Purchased by Assuming Bank. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement:
>
> (a)  . . .
>
> (b)  any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided,

5

that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing . . . .

Before failing, Old Bank began a foreclosure action against each of Ray's two units. After gaining clear title to each unit, New Bank sold each unit. For one unit, the principal balance was $278,904.90, the unpaid interest was $38,917.70, and the other unpaid expenses were $19,589.80. New Bank received $71,361.74 from the sale. For the other unit, the principal balance was $278,904.90, the unpaid interest was $25,468.15, and the other unpaid expenses were $3,774.31. New Bank received $72,762.29 from the sale.

In March 2012, the FDIC served Property Transfer an administrative subpoena for documents pertinent to the closing of each of Old Bank's loans to Ray. In April 2012, Property Transfer sent responsive documents to the FDIC. Eight days after receiving the documents, the FDIC submitted to First American a written notice of the FDIC's claims under the closing protection letters. In May 2012, the FDIC sued First American under the closing protection letters for breach of contract (Counts V and VIII) to recover the "actual loss" that "arose out of" Property Transfer's "failure" and "dishonesty." Also, the FDIC sued Property Transfer for breach of contract (Counts I and V), for breach of fiduciary duty

6

(Counts II and VI), and for negligent misrepresentation (Counts III and VII).

Property Transfer settled; First American did not.

After a bench trial of the FDIC's claims against First American, the district court entered judgment for the FDIC and against First American on each count alleging breach of contract. On appeal, First American presents four issues:

1. Whether the district court erred in concluding that the FDIC could assert breach-of-contract claims against First American based on the closing protection letters that once belonged to BankUnited, F.S.B., (Old Bank) when the FDIC, as Old Bank's receiver, sold all of Old Bank's assets — including the closing protection letters — to Bank United, N.A., (New Bank).

2. Whether the district court erred in construing the closing protection letter notice provision — expressly requiring notice to First American within 90 days of discovery of a "loss" — to require notice only after discovery that the loss might support a closing protection letter claim, and in allowing the FDIC to recover despite sending notice more than two years after its actual loss.

3. Whether the FDIC proved at trial that its actual loss arose from the conduct of the title agent when, as a result of the closings, Old Bank received first-priority liens on both properties, successfully foreclosed on both properties, and could have sought a deficiency judgment against the borrower.

4. Whether the district court erred in awarding more than $500,000 in damages by accepting a calculation methodology based on losses incurred by a third party without regard to the loss actually incurred by the FDIC, and by improperly applying Florida's collateral source rule to ignore the FDIC's insurance recovery.

## 2. Standard of review

To the extent that First American challenges a finding of fact by the district court, review is for clear error. *Jones v. United Space Alliance, L.L.C.*, 494 F.3d 1306, 1309 (11th Cir. 2007). To the extent that First American challenges a finding of law by the district court, review is *de novo*. *Jones*, 494 F.3d at 1309. When calculating damages, the district court interpreted the meaning of "actual loss" in the closing protection letters. Because the interpretation is an issue of law, review of the district court's calculation of damages is *de novo*. *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1339 (11th Cir. 1997).

First American challenges the district court's interpretation of the purchase agreement, through which the FDIC sold Old Bank's assets to New Bank. The district court found the purchase agreement unambiguous and assessed the agreement's "plain meaning." Similarly, First American advocates a "plain and unambiguous reading" of the purchase agreement. A district court's interpretation of an unambiguous contract presents a question of law, and review is *de novo*. *United Ben. Life Ins. Co. v. U.S. Life Ins. Co.*, 36 F.3d 1063, 1065 (11th Cir. 1994).

8

### 3. Right to assert a breach-of-contract claim

First American argues that, because the FDIC sold Old Bank's assets, including the closing protection letters, to New Bank and because the FDIC no longer "owns" the closing protection letters, the district court erred in concluding that the FDIC could assert a breach-of-contract claim against First American under the closing protection letters.  Interpretation of the purchase agreement, by which the FDIC sold Old Bank's assets to New Bank, determines whether the FDIC sold or retained the right to assert a breach-of-contract claim against First American under the closing protection letters.

In the first sentence of Section 3.1 of the purchase agreement, the FDIC "sells, assigns, transfers, conveys, and delivers" to New Bank "all right . . . in and to all of the assets."  However, Section 3.1 expressly excludes from the conveyance the assets specified in Sections 3.5 and 3.6.[1]  Schedule 3.2 of the purchase agreement defines as an asset all "Loans," and Article I defines "Loans" as "all . . . claims . . . arising under or based upon Credit Documents."  Article I defines "Credit Documents" as "the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan."  Because the closing protection letters "relate to" and "were executed in connection with" the two loans that Old

---

[1] Neither a party nor the district court finds Section 3.6 pertinent to this action.

Bank extended to Ray, the closing protection letters are "Credit Documents."

Therefore, a claim "arising under or based upon" a closing protection letter is a

"Loan."

The FDIC sold to New Bank the right to assert a claim "arising under or

based upon" the closing protection letters, unless the right is expressly retained by

Section 3.5 of the purchase agreement.  The pertinent sections of the purchase

agreement are Sections 3.5(b)(i), (b)(ii), and (b)(iv).  Section 3.5(b) is not

constructed with reference to the reservation of claims and rights arising from

specified assets; Section 3.5(b) is constructed with reference to the reservation of

claims and rights against certain specified parties.  Section 3.5(b)(i) states:

> The Assuming Bank does not purchase . . . (b) any interest,
> right, action, claim, or judgment against (i) any officer, director,
> employee, accountant, attorney, or any other Person employed
> or retained by the Failed Bank or any Subsidiary of the Failed
> Bank on or prior to Bank Closing arising out of any act or
> omission of such Person in such capacity . . . .

Section 3.5(b)(i) exempts from the sale of assets a right or a claim against any

"Person employed or retained" by Old Bank.  *Webster's Third New International*

*Dictionary* 743 (1993) defines "employ" as "to use or engage the services of" (as

in "to employ the services of a gardener").  Also, *Webster's* at 1938 defines

"retain" as "to keep in pay or in one's service" (as in "to retain the services of a

gardener").  In other words, Section 3.5(b)(i) broadly exempts from the sale of

assets a claim against a person who was paid by Old Bank and who rendered to

10

Old Bank a service that resulted in a right or claim.  This understanding of Section 3.5(b)(i) comports comfortably with the list of named "Persons" — any "officer, director, employee, accountant, attorney, or any other Person" — a list that encompasses persons both corporate and non-corporate, both employee and independent contractor, both titled and untitled, and both professional and non-professional.  Use of the encompassing phrase "any other Person" belies any suggested narrowness in the clause and confirms that the rendering of a service that can result in a claim, not the mode of the person's compensation or the nature of the person's duty, is the attribute common to those on the list in Section 3.5(b)(i).  First American falls within the broad scope of Section 3.5(b)(i).

The next provision in the purchase agreement is Section 3.5(b)(ii), which states:

> The Assuming Bank does not purchase . . . (b) any interest, right, action, claim, or judgment against . . . (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank . . . .

Section 3.5(b)(ii) exempts from the sale of assets a right or claim against "any underwriter of . . . [an] insurance policy of" Old Bank.  Because First American is an underwriter of Old Bank's title insurance, Section 3.5(b)(ii) exempts from the sale of assets — and reserves to the FDIC — a right against First American.  Further, the FDIC retained the right to assert a breach-of-contract claim against First American under either a title insurance policy or a closing protection letter

11

because a title insurer, by definition, can issue either a title insurance policy or a closing protection letter or both.  (Section 627.786, Florida Statutes, explicitly allows a title insurer to issue a closing protection letter.)  By reserving to the FDIC the right to assert a claim against First American, Section 3.5(b)(ii) reserves a claim under either the title insurance policies or the closing protection letters or both.

Section 3.5(b)(iv)[2] states:

> The Assuming Bank does not purchase . . . (b) any interest, right, action, claim, or judgment against . . . (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank . . . .

Section 3.5(b)(iv) exempts from the sale of assets a right or claim against "any other Person whose action or inaction may be related to any loss . . . incurred by" Old Bank or its assigns.  First American is a "Person" as defined in Article I of the purchase agreement.  By issuing the closing protection letters, First American agreed to reimburse Old Bank or its assigns for "actual loss" "arising out of" Property Transfer's "failure" or "dishonesty."  Both First American's "action" in issuing the closing protection letters and First American's "inaction" in not reimbursing the FDIC are "related to" the loss "incurred by" the FDIC.  Even if

---

[2] In the "Opinion and Order," the district court inadvertently mislabels Section 3.5(b)(iv) as "Section 3.5(b)(iii)."

Sections 3.5(b)(i) and (b)(ii) were inapplicable, Section 3.5(b)(iv), a contractual "catch-all," exempts from the sale the right to assert a claim against First American.

First American argues that under this construction of Sections 3.5(b)(i), (b)(ii), and (b)(iv) the FDIC retains both title insurance policies and closing protection letters, the retention of which is contrary to the parties' stipulation that the FDIC sold the title insurance policies to New Bank. But First American fundamentally misreads the agreement.

Section 3.1 accomplishes the agreed sale by identifying the assets sold, including the claims sold. Also, Section 3.1 expressly and unconditionally defers to Section 3.5 by selling assets "[w]ith the exception of certain assets expressly excluded in Sections 3.5 and 3.6." Finally, Section 3.5 reserves claims to the FDIC by identifying certain persons against whom the FDIC retained "any interest, right, action, claim, or judgment," provided that the events "giving rise to" the "interest, right, action, claim, or judgment" occurred before Old Bank failed. In other words, Section 3.5 carves out of Section 3.1 claims against identified persons arising from a temporally limited set of events and, as a result, all claims are sold except those claims. Under the express terms of the purchase agreement, the claim, or the right to sue, is a legal interest distinct from the document under which the right arises. Thus, some claims arising from a title insurance policy are sold and some are not,

13

depending on whether the person against whom the claim is asserted is an identified person and on whether the claim arose from events that occurred before Old Bank failed. The fact that the FDIC sold Old Bank's title insurance policies to New Bank under Section 3.1 has no bearing on whether the FDIC retained certain title insurance policy <u>claims</u> against certain persons identified in Section 3.5.

In sum, the purchase agreement reserves to the FDIC the right to assert a breach-of-contract claim against First American under a closing protection letter. Under Section 3.5(b) of that agreement, the FDIC retains certain claims against certain specified parties, and First American is one of those parties. We need not determine whether the closing protection letters themselves were expressly reserved to the FDIC because, under the terms of the purchase agreement, the right to sue was reserved. That is all that matters.[3]

Finally, in arguing on appeal that New Bank, not the FDIC, is the proper plaintiff, First American objects:

> The end result could well be double liability for an opposing party. After all, what is to stop New Bank from bringing its own [closing-protection-letter] claims against First American on these same [closing protection letters]? New Bank could simply contend that the Purchase Agreement did convey the [closing protection letters], and First American could do nothing to challenge it, forcing First American to indemnify two different parties for the same loss.

---

[3] For the same reasons, we need not determine whether a closing protection letter is severable from, or "tethered to" (as First American claims), a title insurance policy.

14

First American's objection to the prospect of "double liability" serves to focus helpfully on a reliable and convenient remedy for First American's perceived dilemma. Rule 19(a)(1), Federal Rules of Civil Procedure, states:

(a) **Persons Required to Be Joined if Feasible.**

    (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

        (A) . . .

        (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

            (i) . . .

            (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If during the pleading stage of this action First American had sought relief under Rule 19(a) and had alleged that New Bank claimed an interest in the "subject of the action," New Bank would have been required to appear as a party and either confirm or deny the alleged interest. If New Bank had confirmed the alleged interest, New Bank would have remained a party, and the district court would have determined the validity of New Bank's alleged interest. If New Bank had denied or disclaimed the alleged interest, New Bank would have no claim. In either

15

instance, the real party in interest is determined, and First American is safe from the threat of double liability.

Rule 19(a) anticipates the need, at the instance of a party in doubt, to determine the proper plaintiff with clarity and finality.  (Of course, a counterclaim that joins New Bank and seeks a declaratory judgment effects the same, simple, salutary result for First American.)  First American chose to forbear the Rule 19(a) remedy, chose to preserve and persist in the claim that the FDIC is the wrong plaintiff, and chose to preserve and persist in the argument about the risk of double liability.  After choosing to forbear the readily available remedy, First American cannot complain about New Bank's absence.

### 4. Timely notice

Although the closing protection letters require First American to reimburse Old Bank or its assigns for "actual loss" "arising out of" Property Transfer's "failure" and "dishonesty," the closing protection letters exonerate First American from liability "unless notice of loss in writing is received by [First American] within ninety (90) days from the date of discovery of such loss."  First American argues that the district court erred in construing this notice provision to permit notice within ninety days after the FDIC's discovery of facts that reveal a claim against First American under the closing protection letters.

16

The notice provision in the closing protection letters conforms precisely to Rule 69O-186.010, Florida Administrative Code. *FDIC v. Stewart Title Guaranty Co.*, No. 4:12-cv-10062-JLK, 2013 WL 1891307, at *4 (S.D. Fla. May 6, 2013) (King, J.), persuasively explains:

> A plain reading of the [rule] might be that the only discovery an insured need make before the 90 day clock starts is that a financial loss occurred. However, such an interpretation would disregard the need for the knowledge that such loss could potentially be a *covered* loss. It would be absurd, for example, to interpret the [closing protection letter] to require the insured to send notice of claim every time it lost money on a mortgage transaction. Like any insurance policy, the Florida [closing protection letter] includes coverage guidelines for what is, and by implication, is not, a covered loss.

Until the discovery of facts that reveal a claim, the insured cannot confirm that a loss is a "covered" loss under a closing protection letter. Therefore, the closing protection letters require the FDIC to provide written notice within ninety days of discovering facts that reveal a claim. *FDIC v. Attorneys' Title Ins. Fund, Inc.*, No. 1:12-cv-23599-PAS, 2014 WL 4384270, at *5 (S.D. Fla. Sept. 3, 2014) (Seitz, J.) ("The phrase 'the date of discovery of such loss' includes not only the date of discovery of actual loss, but also when the indemnitee has knowledge of specific acts giving rise to a claim covered by the [closing protection letter]."); *Stewart Title*, 2013 WL 1891307, at *6 ("Therefore, the Court simply needs to determine whether the date at which discovery of both actual loss and the facts giving rise to potential coverage had taken place was within 90 days of the FDIC's

17

January 10, 2012 claim letter."); *FDIC v. Attorneys' Title Ins. Fund, Inc.*, No. 1:10-cv-21197-PCH, Doc. 164 at 11 (S.D. Fla. May 17, 2011) (Huck, J.) ("So long as the FDIC or its predecessor IndyMac had knowledge of specific acts that may trigger [closing-protection-letter] coverage . . . , it 'discovered' an actual loss within the meaning of the [closing protection letter].").

First American argues that, even if the district court correctly interpreted the closing protection letters, the FDIC failed to prove that First American received notice within ninety days after the FDIC's discovering facts that revealed a claim under the closing protection letters.  However, the district court found, "Before obtaining [the documents provided by Property Transfer in response to the FDIC's administrative subpoena], the FDIC could not have discovered that the wire transfer did not come from Mr. Ray, but had come from Masterhost, and the other information regarding the mortgage fraud scheme."

Sean Newbold, the FDIC's Rule 30(b)(6) witness, reviewed the Old Bank documents and reviewed responsive documents from Property Transfer.  First American's argument ignores the decisive distinction between, on one hand, Newbold's admitted lack of first-hand knowledge of the history reported in the pertinent documents and, on the other hand, Newbold's first-hand knowledge of the contents of the documents, that is, his first-hand knowledge of the disclosures the documents contain.  Newbold's testimony establishes the latter, not the former.

18

In other words, Newbold lacks first-hand knowledge of events at the closing of Ray's unit purchases, but Newbold knows first-hand what Old Bank's and Property Transfer's documents report about events at the closing.

Based on his first-hand examination of the pertinent documents, Newbold determined that only Property Transfer's documents, not Old Bank's documents, contain a report of facts that reveal a claim under the closing protection letters. Therefore, Newbold testified that, until the FDIC received Property Transfer's documents, the FDIC lacked knowledge of facts that reveal a claim.

The district court correctly determined from Newbold's testimony, from the distinct alacrity with which the FDIC notified First American of a claim after receiving the subpoenaed documents, and from evidence of the other attendant circumstances that the FDIC proved that First American received notice within ninety days after discovering facts that revealed a claim under the closing protection letters.

In effect, First American's argument is no more than the familiar but futile demand for "proof of a negative," a demand that is famously impossible to satisfy. The FDIC proved the source of information that alerted the FDIC to the claim against First American. Because the FDIC need not prove the negation of every other possible source of information about the claim, First American must

19

controvert the FDIC by proving an earlier source of information, a proof First American failed to deliver.

## 5. Causation

First American argues (1) that "as a result of the closings, Old Bank received first-priority liens on both properties, successfully foreclosed on both properties, and could have sought a deficiency judgment against the borrower" and, therefore, (2) that the FDIC failed to prove at trial that the FDIC's loss "arose from" the conduct of the title agent.  The Supreme Court of Florida has defined "arising out of" in accord with its "plain meaning":

> The term "arising out of" is broader in meaning than the term "caused by" and means "originating from," "having its origin in," "growing out of," "flowing from," "incident to" or "having a connection with."  As we implied in [*Race v. Nationwide Mutual Fire Insurance Co.*, 542 So. 2d 347, 351 (Fla. 1989)], this requires more than a mere coincidence between the conduct (or, in this case, the product) and the injury.  It requires some causal connection, or relationship.  But it does not require proximate cause.

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539–40 (Fla. 2005) (citations omitted).

Several district courts have interpreted "arise out of" in Rule 69O-186.010 to require only a "causal connection" or a "minimal causal relationship."  *See Attorney's Title*, 2014 WL 4384270, at *5 ("[A Florida closing protection letter] merely require[s] that [an actual] loss 'arise out of' the agent's misconduct, which

20

in Florida is only a 'causal connection' but not proximate cause."); *Brinker v. Chicago Title Ins. Co.*, No. 8:10-cv-1199-T-27AEP, 2012 WL 1081211, at *10 (M.D. Fla. Feb. 9, 2012) (Porcelli, M.J.) ("[A Florida] closing protection letter clearly provides that [the closing agent]'s alleged fraud or dishonesty must have had at least a minimal causal relationship to the Plaintiffs' loss in order for Plaintiffs to recover under the indemnity contract."), *adopted by*, 2012 WL 1081182 (M.D. Fla. Mar. 30, 2012) (Whittemore, J.).

Property Transfer's "failure" and "dishonesty" undoubtedly bore at least a "minimal causal relationship" to Old Bank's "actual loss." Although Property Transfer certified that Ray's down payment was his money, Property Transfer accepted the down payment from Masterhost, an entity with no discernible connection to Ray. (In fact, Masterhost was owned by Christopher Albert, the son of the sellers of one unit and the brother of the seller of the other unit.) As a result of Property Transfer's "failure" to follow Old Bank's closing instructions, that is, as a result of Property Transfer's "failure" and "dishonesty," Old Bank funded two loans to an unqualified "straw buyer" who had no financial investment in the units and who in his applications for the loans materially exaggerated his income.

Although Old Bank received a first-priority lien on each unit, Old Bank lacked the bargained-for benefit of an honest, diligent closing agent and a borrower both invested in the units and motivated to repay the loans. Also, although Old

21

Bank successfully foreclosed on each unit and could have elected to pursue deficiency judgments against Ray, an elective, alternative remedy serves to affect, at most, only the measure of damages, not to prove the lack of a minimal causal relation between a corrupt closing and a lender's consequent loss. Undoubtedly, Old Bank's "actual loss" has at least a "minimal causal relation" to Property Transfer's "failure" and "dishonesty."

## 6. Damages

Finally, First American argues that in awarding more than $500,000 in damages the district court erred (1) "by accepting a calculation methodology based on losses incurred by a third party without regard to the loss actually incurred by the FDIC" and (2) "by improperly applying Florida's collateral source rule to ignore the FDIC's insurance recovery."

### A. Loss incurred

The district court calculated the "actual loss" as "the outstanding loan balance less the sales proceeds of the collateral property." First American argues that, because New Bank collected the sales proceeds of the collateral property, this calculation fails to distinguish the FDIC's loss from New Bank's loss. First American argues that the accurate calculation of damages is the loan balance less the book value that New Bank paid the FDIC for each loan. First American argues

22

that, because the FDIC cannot establish the book value for each loan, the district court should have denied recovery.

As the district court stated, "Under the reasonable certainty rule, recovery is denied only if the FDIC fails to establish damages to a reasonable degree of certainty." *See Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1212 (11th Cir. 2006) ("Under the certainty rule, . . . recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty."). Acknowledging the circumstances of a failing bank, the district court correctly reasoned that achieving "reasonable certainty" does not require a calculation of the book value of each loan:

> The FDIC's main responsibility when it becomes the receiver of a failing bank is to determine a cost-effective and efficient method of dealing with the bank's assets and liabilities. As receiver, the FDIC attempts to ensure service continuity and that panicked depositors do not withdraw their funds from the bank. In the midst of a bank closing, to require the FDIC to provide a calculation of the book value of each loan in a failing bank's portfolio as of the date of the transfer for fear that the FDIC would later discover a mortgage fraud scheme, or some other claim, would be impractical.

Rather than calculating each loan's book value, the FDIC establishes with reasonable certainty each loan's principal balance, each loan's unpaid expenses, and each unit's sale price, information from which the FDIC can calculate the total loss to the FDIC.

23

Further, the FDIC need not distinguish the FDIC's loss from New Bank's loss. Absent contrary evidence, a reasonable deduction from the attendant circumstances is that the purchase agreement, which excludes from the sale of assets the right to assert a claim under the closing protection letters, concomitantly excludes from the purchase price any anticipated amount that First American might pay based on the FDIC's claims under the closing protection letters.

The district court correctly concluded that the "actual loss" is "the outstanding loan balance less the sales proceeds of the collateral property" — $265,550.72 for one unit and $235,421.07 for the other unit.

24

*B. Insurance recovery*

First American argues that, based on "a misapplication of Florida's collateral source rule," which — First American asserts — applies only to a tort action, not to a contract action, the district court failed to account for the FDIC's insurance benefits. However, the collateral source rule "appl[ies] . . . to causes of action in contract, as well as to actions in tort." *Citizens Prop. Ins. Corp. v. Hamilton*, 43 So. 3d 746, 751 (Fla. 1st DCA 2010) (Kahn, J.). Because the collateral source rule "prohibit[s] both the introduction of evidence of collateral insurance benefits received[] and the setoff of any collateral source benefits from the damage award," *Citizens Prop.*, 43 So. 3d at 751, the district court correctly held that "the FDIC's damages shall not be offset by the insurance benefits."

**7. Standing**

In response to First American's defense that under the purchase agreement the FDIC no longer "owns" the closing protection letters, the FDIC argues that First American enjoys no "standing" to contest the contracting parties' interpretation of the purchase agreement. The district court agreed that, because First American was a stranger to the purchase agreement between the FDIC and New Bank, First American lacked "standing" to contest the contracting parties' interpretation of the purchase agreement. The district court characterized the perceived defect in First American's defense as "lack of standing" because of

25

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927 (11th Cir. 2013), which holds that, if a plaintiff is not an intended third-party beneficiary of a contract, the plaintiff lacks "standing" to sue under the contract and that, consequently, the district court lacks subject matter jurisdiction.

But First American advances an interpretation of the purchase agreement not as a plaintiff in pursuit of a claim but as a defendant in defense against a claim. A defendant's putative lack of "standing" to assert a defense presents no bar to a district court's exercising subject matter jurisdiction. Therefore, whether First American can assert a defense under the purchase agreement is not an issue of "standing" in the same sense that the term "standing" is used in resolving a challenge to the plaintiff's "standing" to maintain a claim. And the presence or absence of a defense is not a matter with a jurisdictional consequence.[4]

---

[4] In *Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, N.A.*, 758 F.3d 592, 603–04 (5th Cir. 2014), Judge Clement observes:

> The FDIC argues that the Landlords lack standing because they cannot, as a non-third-party beneficiary to the contract, show that the properties were transferred to Chase. The Landlords have no such issue. To demonstrate standing, the Landlords need to show (1) "an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). The Landlords make that showing. They claim to have (1) suffered an injury (loss of rents), that was (2) causally connected to Chase's conduct (not paying rents that were due), and (3) could be redressed by an award of unpaid rents.

26

## CONCLUSION

The judgment of the district court is **AFFIRMED**.

---

Similarly, in *Interface Kanner*, the assignment of a lease from WaMu to the FDIC to JPMorgan directly caused the landlord to lose rental income, and a money judgment against either the FDIC or JPMorgan would redress the loss.