# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 18, 2019

Lyle W. Cayce
Clerk

—————

No. 18-30147

—————

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP, P.L.C.,

Requesting Parties–Appellants,

v.

CLAIMANT ID 100217946,

Objecting Party–Appellee.

—————————

Appeal from the United States District Court
for the Eastern District of Louisiana

—————————

Before WIENER, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:

This is an appeal from an award to Claimant ID 100217946 (Claimant) under the Settlement Program established following the *Deepwater Horizon* oil spill. The Claims Administrator concluded that the non-profit Claimant is entitled to compensation of nearly $15 million. An Appeal Panel within the Settlement Program affirmed, and the district court denied discretionary review. BP appeals, arguing that two donations were improperly counted by the Claims Administrator and the district court was required to review the award. We affirm the district court's judgment.

**I**

In April 2010, an explosion on the *Deepwater Horizon*, a mobile offshore drilling unit leased by BP Exploration & Production, Inc., BP America Production Company, and BP, P.L.C. (collectively, BP), caused the discharge of millions of gallons of oil into the Gulf of Mexico.[1] Two years later, BP entered into the "*Deepwater Horizon* Economic and Property Damages Settlement Agreement" with a class of individuals and entities allegedly injured by the *Deepwater Horizon* oil spill. The Settlement Agreement created the Settlement Program under which claims for settlement benefits are reviewed by the Claims Administrator, whose decisions may be appealed to an Appeal Panel.

Businesses seeking settlement benefits as compensation for economic losses "must establish that their loss was due to or resulting from the Deepwater Horizon Incident" by meeting the applicable "causation requirement[]." The Settlement Agreement imposes different causation requirements on businesses located in different geographic "zones." Businesses located in Zone A are not required to establish causation unless they fall into one of the agreed-upon exceptions. Claimant is located in Zone A and is not one of the agreed-upon exceptions, so it was not required to establish causation.

Once causation is established or inferred, claimants must prove an economic loss using the methodology in Exhibit 4C. Under Step 1 of the formula, claimants compare their Variable Profit in the Compensation Period—a consecutive three-month period between May and December 2010— to their Variable Profit during a Benchmark Period of the claimant's choosing. The Variable Profit is calculated by considering the total monthly revenue over

---

[1] *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013).

the period and subtracting the corresponding variable expenses over the same time period, including "Variable Costs," variable portions of salaries, and other expenses. If the Claimant has less Variable Profit in the Compensation Period than in the Benchmark period, it is entitled to compensation for that difference. Under Step 2 of the compensation formula, claimants are also compensated for incremental profits the claimant might have expected to generate in 2010 in the absence of the spill, based on the claimant's revenue trend before the spill. Claimants may also be entitled to a Risk Transfer Premium (RTP) depending on where the business is located. The amount of the risk transfer premium is based on the total Step 1 and Step 2 Compensation multiplied by a variable found in Exhibit 15 of the Settlement Agreement, the RTP Chart.

Claimant is a non-profit organization that solicits donations for its own programming and distributes grants to other non-profit organizations. Claimant submitted a Business Economic Loss (BEL) Claim to the Settlement Program. The Claims Administrator determined that Claimant was eligible for $5,814,307.79 at Step 1 Compensation by comparing its Variable Profit in August through October 2010 with the same period in 2009. The Claims Administrator then determined that Claimant was entitled to an RTP of 1.5 times the amount of its losses, which was $8,721,461.69. In addition, the Claims Administrator awarded $7,062.50 of Claimant Accounting support as reimbursement for expenses that Claimant incurred in the claims process. All told, the Claims Administrator awarded $14,542,831.98 to Claimant.

BP appealed the award to a three-member Appeal Panel. It argued that two large donations received by Claimant totaling $8.9 million were improperly included in the economic loss calculation, which resulted in an excessive award. The first donation was an unsecured non-negotiable promissory note for $5,913,491.66 to be paid in eight equal annual installments

beginning June 30, 2010, with interest accruing on the unpaid balance. The other donation at issue was a $3,000,000 pledge to be paid over ten years in annual installments of $300,000, with a check for the first $300,000 attached to the pledge. BP argued there were four issues with the inclusion of these donations in the economic loss calculation: (1) The donations were not "revenue," (2) even if the payments were revenue, Claimant could only treat those payments that were actually received in 2009 as revenue for 2009, (3) if the entire $8.9 million could be properly treated as revenue, the Settlement Program failed to match the donations with corresponding distributions that Claimant granted to other non-profits that should be treated as expenses, and (4) awards made to entities that maintained funds with Claimant should offset Claimant's award to avoid impermissible double recovery.

BP requested that an en banc Appeal Panel review the award to "promote and maintain uniformity and consistency of the Appeal Panel decisions," contending that an Appeal Panel in another case involving a non-profit had ruled differently than the Claims Administrator. The Appeal Panel initially indicated that it would consider the appeal en banc. Before rendering a decision, the Appeal Panel decided not to address the issue en banc. An Appeal Panel then reviewed the decision *de novo* and rejected each of BP's arguments.

BP then requested discretionary review in the district court. BP repeated its arguments with one exception. It did not argue that the award should be offset by awards to other non-profits to whom it had made grants to prevent double recovery. The district court denied discretionary review. BP appeals the denial of discretionary review.

4

## II

We review the district court's denial of discretionary review for abuse of discretion.[2] It is generally an abuse of discretion not to review a decision that "actually contradicted or misapplied the Settlement Agreement, or had the clear potential to" do so.[3] However, we have been careful to note that it is "wrong to suggest that the district court must grant review of all claims that raise a question about the proper interpretation of the Settlement Agreement."[4] It is not an abuse of discretion to deny a request for review that "involve[s] no pressing question of how the Settlement Agreement should be interpreted or implemented, but simply raise[s] the correctness of a discretionary administrative decision in the facts of a single claimant's case."[5] It may also be an abuse of discretion to deny a request for review that raises a recurring issue on which the Appeal Panels are split if "the resolution of the question will substantially impact the administration of the Agreement."[6]

BP argues that the district court abused its discretion by failing (1) to resolve a recurring issue on which the Appeal Panels are split, and (2) to review an Appeal Panel's decision that contradicts the Settlement Agreement. We address each argument.

### A

BP argues that the treatment of grant-making entities like Claimant is "a recurring and important issue in administering the Settlement

---

[2] *Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (citing *Holmes Motors, Inc. v. BP Expl. & Prod.*, 829 F.3d 313, 315 (5th Cir. 2016)).

[3] *Id.* (quoting *Holmes Motors*, 829 F.3d at 315) (internal quotations omitted).

[4] *Id.* (quoting *Holmes Motors*, 829 F.3d at 316) (internal quotations omitted); *see also In re Deepwater Horizon*, 785 F.3d 986, 999 (5th Cir. 2015) ("We do not intend any part of this opinion to turn the district court's discretionary review into a mandatory review. To do so would frustrate the clear purpose of the Settlement Agreement to curtail litigation.").

[5] *Claimant ID 100212278*, 848 F.3d at 410 (quoting *In re Deepwater Horizon*, 641 F. App'x 405, 410 (5th Cir. 2016)) (alterations in original).

[6] *Id.* (quoting *In re Deepwater Horizon*, 632 F. App'x 199, 203-04 (5th Cir. 2015)).

[Agreement]." It reasons that the award is significant because of (1) the amount involved, (2) the "unusually lengthy" analysis of the Appeal Panel, (3) the Panel's reliance on contested characterization of precedent, (4) Claimant's admission that donors play a role in determining how grants are made, and (5) the threat of double-recovery. BP additionally maintains that there is a "split" among the Appeal Panels.

BP points to a decision of an Appeal Panel that excluded from "revenue" funds received by a non-profit that were immediately distributed to other non-profit affiliates. In that appeal, the claimant challenged the Claims Administrator's decision to exclude a state-grant from revenue because the Claims Administrator found the funds were a "pass-through" grant in which the state granted money to claimant and claimant distributed an identical amount to its affiliates. The Appeal Panel upheld the exclusion.

"For [a] ruling to create a conflict with the one now before us, it must have involved substantially identical claimants relying on substantially identical documentation."[7] The one award identified by BP does not show a split among the Appeal Panels. In that case, the receipt of funds coupled with an exactly matching distribution in the same month supported the Claims Administrator's decision to treat the funds as pass-through and not revenue. Here, BP has not shown that Claimant is engaged in the same type of dollar-for-dollar distribution. Claimant does not dispute that it grants a large percentage of funds it receives to other entities. However, Claimant contests the characterization of its funding as merely a pass-through, and the Appeal Panel agreed. The question of what particular percentage of funds that a charity passes through will give rise to the characterization of the donations

---

[7] *Claimant ID 100128765 v. BP Expl. & Prod., Inc.*, 709 F. App'x 771, 773 (5th Cir. 2017) (per curiam).

as pass-throughs instead of revenue is a difficult one. But, we cannot say that the Appeal Panels are split. The Appeal Panel here explicitly rejected BP's argument that Claimant is primarily a pass-through organization because a large part of its donations are passed through and donors are involved in the ultimate decision about where donated funds are spent. Rather than reflecting a split that must be resolved by the district court, the Appeal Panel's decision reflects that the Panels are conscious of factual differences that may distinguish claimants.[8]

Nor can we agree with BP's argument that the size of the award requires appellate review. While any multi-million dollar award is "significant" in the ordinary sense, the size of the award alone does not make the issue significant enough to require district court review.[9] Further, the "unusually lengthy" decision of the Appeal Panel is not a reason to doubt the Panel—it is an indication that the Panel thoroughly considered all of BP's arguments and assessed the documentation provided by Claimant to apply the Settlement Agreement. Finally, BP did not argue to the district court that it should have addressed the specter of double recovery, so BP cannot rely on that argument to show that the district court abused its discretion.[10]

---

[8] *See Claimant ID 100190818 v. BP Expl. & Prod., Inc.*, 718 F. App'x 220, 222 (5th Cir. 2018); *Claimant ID 100051301 v. BP Expl. & Prod., Inc.*, 694 F. App'x 236, 240 (5th Cir. 2017) ("[T]he fact that Appeal Panels have reached different conclusions for this issue depending on the circumstances of each case does not represent the type of Appeal Panel split that would require the district court's review.").

[9] *See In re Deepwater Horizon*, 785 F.3d 1003, 1021 (5th Cir. 2015) ("*Non-Profit Decision*") ("[D]enying this award because of its size would open the floodgates to a flurry of challenges to nonprofit awards, undermining the aims of the [settlement program].")

[10] *In re Deepwater Horizon*, 814 F.3d 748, 752 (5th Cir. 2016) (citing *Cent. Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, Nat'l Ass'n*, 780 F.3d 296, 300-01 (5th Cir. 2015)) ("Claimants did not make this argument in their memorandum in support of their motion before the district court, and it is accordingly forfeited.").

## B

BP also argues that the district court abused its discretion because the award is contrary to the terms of the Settlement Agreement. BP argues three ways in which the award is contrary to "economic reality": (1) The donations at issue are not "revenue," (2) if the donations are revenue, the Appeal Panel did not properly match expenses to revenue in the month earned, and (3) if the donations are revenue, the entire $8.9 million should not be recorded in 2009.

## 1

BP's contention that the $8.9 million donations are not "revenue" is contrary to this court's *Non-Profit Decision*.[11] In that case, we were confronted with the argument that donations and grants to non-profits did not qualify as "revenue" for purposes of Exhibit 4C's compensation formula.[12] We recognized that "modern nonprofits are commercial entities that seek to generate cash surpluses," and held that revenue includes donations and grants to non-profits.[13] We also addressed the work that non-profits do to raise funds, and noted that non-profits must do significant work to solicit donations and grants "to keep their doors open."[14] We rejected BP's narrow view of the work that non-profits perform to "earn their revenue" and upheld the Claims Administrator's reading of the Settlement Agreement that non-profit donations and grants are typically "revenue" under Exhibit 4C.[15]

While acknowledging our *Non-Profit Decision*, BP nevertheless argues that these particular $8.9 million donations are not revenue. It insists that the donations are not made to Claimant, but that Claimant merely acts as a "'fiduciary' for the ultimate beneficiaries." BP likens Claimant to Western

---

[11] 785 F.3d 1003 (5th Cir. 2015).
[12] *Id.* at 1012.
[13] *Id.*
[14] *Id.* at 1013.
[15] *Id.*

Union, arguing that none of the funds belong to Claimant and must be distributed according to the wishes of the donors. The basis of this argument is that Claimant solicits donations for placement in donor-advised funds, where the donor expresses how the donations are to be spent. Despite the fact that the Internal Revenue Code requires all charitable donations in donor-advised funds to be exclusively the funds of the non-profit,[16] BP argues that Claimant is ultimately subject to the will of donors and therefore those donations cannot be considered Claimant's revenue. The Appeal Panel disagreed and focused on the aspects of Claimant's operations that cannot be considered pass-through, such as the workshops it conducts, the series of lectures and performances it presents, and the funding of a police perception survey which was used in undertaking police reform in Claimant's community. The Appeal Panel held that the contested donations were unrestricted donations made to Claimant, and thus fall squarely within the definition of "revenue" we set forth in *Non-Profit Decision*.[17]

BP argues that this factual determination was error and urges us to remand to the district court for evidentiary hearings to determine whether the particular donations were of donor-advised funds. However, the district court did not abuse its discretion by deferring to the Claims Administrator's discretionary administrative decision regarding the documentation required to substantiate a BEL claim.[18] The Settlement Agreement contemplates that the Claims Administrator will review supporting documentation to process claims. The district court's decision to defer to the Claims Administrator's

---

[16] *See* 26 U.S.C. § 170(f)(18).

[17] 785 F.3d 1003 (5th Cir. 2015).

[18] *See Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (quoting *In re Deepwater Horizon*, 641 F. App'x 405, 410 (5th Cir. 2016)) (alterations in original).

substantiation requirements and factual finding that the two donations at issue were unrestricted grants was not an abuse of discretion.

## 2

BP also argues that, even if the donations are revenue, the Claims Administrator did not properly match the $8.9 million donations with expenses. In BP's view, Claimant gave some or all of the donations at issue to other non-profits and those grants should be considered "Variable Expenses" that must be matched to the month in which the donations were received. The Claims Administrator determined the expenses of the claim were "not sufficiently matched" and applied "Policy 495" to match the expenses. Policy 495 was created by the Claims Administrator and approved by the district court in response to a decision of this court.[19] We first held in *Deepwater Horizon I*[20] that the Settlement Agreement should be interpreted "in accordance with economic reality" and remanded for the district court to determine whether the agreement required the Claims Administrator to "match" profits and losses.[21] In "matched" profit and loss statements, costs follow revenue—which is registered when generated or received—and this provides a clear picture of net income.[22] In "unmatched" profit and loss statements, revenue is registered when generated or received, and costs are registered when incurred.[23] We noted that unmatched profit and loss statements can "make it appear as if a claimant has suffered damages that he,

---

[19] *See In Re Deepwater Horizon*, 858 F.3d 298, 300-01 (5th Cir. 2017) ("*Policy 495 Decision*").

[20] 732 F.3d 326 (5th Cir. 2013) ("*Deepwater Horizon I*").

[21] *Id.* at 339.

[22] *Policy 495 Decision*, 858 F.3d at 301.

[23] *Id.*

in fact, did not suffer."[24]  Policy 495 was created to address the problem of unmatched revenues.[25]

This court approved of a portion of Policy 495 in our *Policy 495 Decision*.[26]  Policy 495 had five different formulas for matching revenue with expenses, and we upheld only the Annual Variable Margin Methodology (AVMM).[27]  "The AVMM requires the Claims Administrator to match all unmatched profit and loss statements."[28]  We held the other methodologies were impermissible because they required the Claims Administrator to "move, smooth, or otherwise reallocate revenue for claimants," contrary to the express terms of the Settlement Agreement that gives each claimant the right to choose its own Compensation Period.[29]  We had assumed that "process[ing] claims in accordance with economic reality" would comport with the text of the Settlement Agreement, but recognized that will not always be true.[30]  Accordingly, when the text of the Settlement Agreement conflicts with economic reality, the text controls.[31]

The Claims Administrator applied the AVMM to Claimant's claims and matched the unmatched profit and loss statements.  BP is not satisfied with that methodology in this case because, in its view, real matching would correlate any distributions from the $8.9 million donations back to the month in which the donations were generated.  It argues, without support, that the Claims Administrator did not undertake the first step of making line-by-line corrections to a claimant's records.  BP has not identified any errors that

---

[24] *Id.*
[25] *Id.* at 301-02.
[26] *Id.* at 301.
[27] *Id.* at 300-01.
[28] *Id.* at 302.
[29] *Id.* at 303.
[30] *See id.* at 304 (quoting *Deepwater Horizon I*, 732 F.3d 326, 339 (5th Cir. 2013)).
[31] *Id.*

should have been corrected, except for its blanket assertion that the $8.9 million was donated for the express purpose of granting those funds to other organizations.

Policy 495 and the AVMM recognize that the Settlement Agreement does not mandate that BEL claimants keep profit and loss statements under any particular basis, so the Claims Administrator "will analyze the P&Ls under the basis . . . of accounting used by the claimant in the normal course of business." The Claims Administrator analyzed Claimant's profit and loss statements under its usual accounting method, found that such statements were not sufficiently matched, and then applied the AVMM to match them. The Appeal Panel upheld the application of the AVMM. Claimant maintains that it properly attributes expenses to the months in which it distributes funds and that the donations to which BP objects were not tied to any planned or accrued distribution. BP's objection is limited to the individual factual determination of a specific claimant, and denying review was not an abuse of discretion.[32]

**3**

Finally, BP argues that the entire $8.9 million should not be recorded as revenue in 2009. In BP's view, because Claimant did not receive the entire amount in cash in 2009, Claimant should have recorded its donations in the years in which it received cash payments. Claimant records the entire value of unconditional promises to give in the year of the pledge, discounted to present value, in accordance with Generally Accepted Accounting Principles (GAAP), and its auditors approved of this method. BP seeks to reallocate

---

[32] *See Claimant ID 100236236 v. BP Expl. & Prod., Inc.*, 699 F. App'x 308, 310-11 (5th Cir. 2017) (citing *In re Deepwater (Sexton)*, 641 F. App'x 405, 410 (5th Cir. 2016)); *Claimant ID 100051301 v. BP Expl. & Prod., Inc.*, 694 F. App'x 236, 240 (5th Cir. 2017).

revenue to a different time period. We disapproved of such a practice in the *Policy 495 Decision*.[33] Requiring the Claims Administrator to take the revenue, properly allocated under Claimant's normal accounting procedures that follow GAAP, and reallocate them to the month in which Claimant received the cash payment would deprive "claimant [of] the right to choose his or her Compensation Period."[34] The Appeal Panel's decision to apply the Claimant's usual accounting procedure did not contradict the Settlement Agreement. Accordingly, the district court did not abuse its discretion in denying review.

*     *     *

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[33] 858 F.3d 298, 304 (5th Cir. 2017).

[34] *Id.*